THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HENRY CLAY PRESTON, Defendant-Appellant.

First District (5th Division)   Nos. 62547, 77-735 cons.

Opinion filed May 5, 1978.

Peter J. Schmiedel and Jeffrey H. Haas, both of Chicago (Mara Siegel, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Kenneth T. McCurry, and Carol A. Kearney, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

After convictions of murder and robbery in a jury trial, defendant received concurrent sentences of 75 to 150 and 6 to 18 years imprisonment. He presents the following issues on appeal: (1) whether the court's polling procedures improperly coerced a juror to assent to a verdict which was not hers; (2) whether a juror's affidavit may be considered in determining the question of coercion; (3) whether the

deadlock instruction was phrased improperly and was untimely given; (4) whether prosecutorial argument constituted improper comment upon defendant's failure to testify; (5) whether the prosecutor improperly commented upon defendant's unrelated and past bad acts; (6) whether the trial court erred in failing to question the jury during trial regarding certain prejudicial influences; and (7) whether defendant's sentence for murder was excessive.

For the purpose of review, defendant's direct appeal has been consolidated with his appeal from the denial of his post-conviction petition without an evidentiary hearing in which he contends that the trial court erred in failing to hold such a hearing where his petition and supporting affidavits raise substantial constitutional issues.

It appears that on April 8, 1974, between 10:30 and 11 a.m., George Pope, a uniformed security guard with a pistol and holster strapped to his waist, visited the seventh floor apartment of Annie Pegues in a Chicago Housing Authority building where they drank alcoholic beverages throughout the day, so that by 7:45 p.m. Pope was somewhat intoxicated. At this time, the couple left the apartment, crossed the street, and entered a liquor store where Pope purchased more liquor. On their way back to the apartment, Pope became involved in a quarrel with some unidentified boys, and Pegues walked home alone.

At approximately 8:45 p.m., a Chicago Housing Authority security guard was summoned to the seventh floor of Pegues's building. Finding nothing unusual there, he ascended a stairwell and on the ninth floor he observed a trail of blood leading to the 10th floor, where he found the wounded Pope, who exclaimed, "Get my gun." He and police officers who were called to the scene observed that Pope's holster was empty, and they saw no gun in the vicinity. Shortly after his removal to the hospital, Pope died of a bullet wound to the abdomen.

No further information concerning the incident was immediately obtained by the police except that a resident of the ninth floor whose apartment is located across from the elevator stated that she heard two gunshots sometime during the evening of April 8 and that she found a bullet hole in her door which had not been there prior to the sound of gunfire.

Thereafter, on April 18, 1974, James Fleming was arrested for possession of heroin, and homicide investigator Jack Stewart who was assigned to the Pope murder investigation, was called to speak to Fleming who testified that, motivated only by fear for the safety of his wife and six-year-old daughter, he gave a statement which implicated defendant and led to the recovery of Pope's gun.

At trial, Fleming (a five-year friend of defendant) also testified that on April 8, at approximately 10:15 p.m., defendant visited him at the home of

his parents, where defendant stated that he was riding in an elevator with a man who voiced a need to urinate. Defendant volunteered to hold the elevator door open while this man urinated in the hallway; but, instead, approached him from behind, removed the revolver from his holster, and announced a holdup. He said the man turned and approached him and he fired the gun and, when the man kept coming, he fired again. At the conclusion of this account, defendant showed Fleming a .38-caliber revolver which he had pulled from his waistband and removed from it two spent and four unspent cartridges and also exhibited a wallet.

The pair then left the apartment and proceeded to the home of a junkman, Percy Kight, to whom defendant sold the gun for $40, receiving $32 in cash and a promise that the balance would be paid in a couple of days. They next proceeded to a destination where defendant purchased $23 worth of dope, which they brought back to Fleming's place where they each "shot up."

On April 10, Fleming returned to the Kight home and asked for $8, stating that the gun was his. Kight said he had given the money to defendant earlier that day. Fleming testified that he returned to Kight's house once more, between April 10 and April 18, in the company of "Hop" to sell some junk but that Kight was not at home. He did not enter nor did he remove a television at that time. Kight's testimony corroborated Fleming's account of the gun sale, but he was not asked whether a television had been removed from his home.

On April 18, Officer Stewart recovered a .38-caliber revolver from Kight. Through the comparison of its serial number to that recorded in Pope's gun registration form and by means of ballistic tests, this gun was determined to be the property of Pope and the weapon used to kill him.

The defense presented no evidence at trial, but in opening statement stated its theory that it was Fleming who had killed Pope. To this end, defendant's cross-examination of Fleming elicited that he was unemployed; that his addiction to heroin cost $200 to $300 per week; that he obtained the means of procuring heroin through the generosity of his family and friends and from the collection and sale of discarded junk; that he was twice previously convicted of robbery; and that although arrested for the possession of heroin on April 18, he was not convicted of this offense, as the arresting officer testified that heroin was not found in his possession. Additionally, defendant's counsel made two purported offers of proof; *i.e.*, if Cheryl Whitehead was called she would testify that on April 16 or 17, she saw Fleming leaving the Kight house with a television and that if Fleming's attorney were called he would testify that Fleming stated that the police agreed to drop the charge of possession of narcotics against him.

During the course of the State's case, the gun identified as the murder

weapon was left on the defense table while counsel and the court conversed at a side bar. A juror toward whom the barrel of the weapon happened to be pointed asked a deputy sheriff to turn it so that it was not pointed in her direction. In making the request, this juror remarked that guns always made her nervous, which caused the other jurors to laugh. The deputy sheriff acceded to the juror's wish and changed the position of the gun. On this basis, the defense moved for a mistrial, which was denied; whereupon, defense counsel stated:

"I would like to bring up a matter. Yesterday's newspapers throughout the City of Chicago there was a story about forty homicides committed, seventy-two over a period, I think twenty-four of them were committed by handguns. I ask the Court to examine the jurors whether or not they may be influenced by having read, or whether they have read about these incidents, whether their ability to serve as jurors would in any way be influenced by these occurrences."

After the trial court denied this motion, the defense moved for a mistrial, which was refused.

During closing argument, defense counsel emphasized Fleming's addiction to drugs; the unlikelihood that his family would willingly subsidize the expensive habit of so disreputable a character or that he would be concerned for their safety; the further improbability that his habit could adequately be supported by finding and selling discarded junk; the unlikelihood that defendant after committing robbery and murder would give a detailed account of the robbery/murder or use a portion of the gun sale proceeds to support Fleming's addiction; and the high probability that it was Fleming who committed these offenses to support his habit and, when police investigation had centered upon him, transferred their attention to defendant by means of a fictitious story. In rebuttal, the prosecutor commented:

"Don't forget James Fleming is an addict. What did they do after they got the $32.00? They went to the local junkie house, the little building on Gladys Street, and bought two bags of dope, went back to Fleming's house and shot up. I guess we know there is more than one addict involved."

The prosecutor also characterized the evidence against defendant as uncontradicted and undenied.

The jurors were instructed and given verdict forms for the charges of robbery, armed robbery and murder, and at approximately 4:25 p.m. they retired to deliberate. At about 11 p.m., the court called counsel into chambers to inform them of its intention to give a deadlock instruction. The defense objected, stating that both sides would agree to such an instruction if given the next day, but it would be prematurely given at that

time; that the language concerning a retrial was improper; and that there was no indication, as the instruction stated, that the same evidence would be produced at a subsequent trial. The trial court rejected these objections and called the jury from their deliberations; whereupon, the following colloquy took place:

"THE COURT: You may be seated. Ladies and gentlemen, have you been able to reach a verdict? I just want to talk to the foreman.

THE FOREMAN: Not completely, your Honor.

THE COURT: I want to talk to the foreman, not to anybody else. Do you think you can arrive at a verdict?

THE FOREMAN: I couldn't tell you at the moment, sir.

THE COURT: Okay. I am going to send you back. I just want to let you know that a large proportion of the cases absolutely certain [sic] cannot be expected. Although the verdict must be the verdict of each individual juror and not a mere acquiescence of the conclusion of others, yet you should examine the questions submitted with proper regard and deference to the opinions of each other and you should listen to each other's opinions with a disposition to decide the case if you can conscientiously do so. If you fail to agree on a verdict, the case must be retried and a future jury must be selected in the same manner and from the same source as you have been chosen, and there is no reason to believe that the case would ever be submitted to 12 men and women more competent to decide, nor can a case be tried any better or more exhaustively than it has been here, or that any more clear evidence could be produced on behalf of either side. Now you can retire and reconsider the verdicts in this case."

Thereafter, at 12:50 a.m., the jury returned a verdict on one of the three charges. The court then sent them back to deliberate on the remaining charges without disclosing which verdict had been returned. At 1:50 a.m., the jury returned the remaining verdicts, finding defendant guilty of robbery and murder but not guilty of armed robbery.

In polling the jury, the following colloquy took place:

"CLERK: Vera Goss, as to the verdict of guilty of murder, was this and is this now your verdict?

JUROR GOSS: (unintelligible)

CLERK: As to the verdict of guilty of robbery, was this and is this now your verdict?

DEFENSE COUNSEL: We would ask for a side bar.

COURT: Poll the jury.

CLERK: Vera Goss, as to the verdict of guilty of murder, was this and is this now your verdict?

JUROR GOSS: Compromise.

DEFENSE COUNSEL: We would ask to be heard.

COURT: Continue the poll."

After the remaining jurors had been polled, the trial court stated:

"Juror Goss, you were asked by the Clerk if your verdict when you signed this was your verdict, and is it still your verdict. What is your answer to that?

DEFENSE COUNSEL: Judge—

COURT: Wait a minute. Is it still your verdict?

JUROR GOSS: Yes.

COURT: Is it still your verdict as of right now?

JUROR GOSS: Yes."

The trial court then entered judgment on the verdicts, which found defendant guilty of robbery and murder. Defense counsel responded by moving for a new trial or, in the alternative, for judgment *n.o.v.* and sought to admit the after trial deposition of Juror Goss as an exhibit in support of said motion. When the trial court refused to admit the deposition, defendant submitted it as an offer of proof.

In her deposition, Juror Goss testified that the deadlock instruction did not have much effect on the jury but that the trial court, in returning them to further deliberate on the remaining two verdicts, did have an effect as the other jurors were repeatedly trying to show her wherein defendant was guilty of murder. She further stated that she had informed the other jurors that they would have to be declared a hung jury, as she could not sign a guilty verdict on the charge of murder. Eventually, in exchange for the other jurors' agreement on a not guilty verdict to charge of armed robbery, she agreed to a guilty verdict on the charge of murder "because they [the other jurors] had talked to me so and I was tired, and I had listened to the judge and I was starting my menstruation and I was hurting, and I had nothing to protect me, and I was tired and I was ready to go home." Finally, she stated that at the time of the jury poll, she intended to tell the trial court that the murder verdict was not her verdict, but when the court interrupted her, saying "Wait, did you sign it?" she was motivated by fear and replied, "Yes."

Turning to the matter of the post-conviction petition, we note that it was supported by the affidavit of defense trial counsel who stated that, although he exercised due diligence, he was unable to discover the identity or whereabouts of the man called "Hop," concerning whom Fleming had testified at trial. Subsequently, he found Hop to be Anthony Harold Taylor, who in his attached affidavit stated that on or about April 9 or 10, 1974, Fleming and he were alone in Fleming's bedroom when the latter produced a .38-caliber pistol. When Taylor declined Fleming's offer to sell the pistol, they proceeded to Kight's home. He left Fleming there, but later that day Fleming said he sold the weapon to Kight for $40 but

had received less than the full purchase price. Taylor also said that Fleming told him he had returned on one occasion to collect the balance of the purchase price and that on or about April 16 they both returned to the Kight house. Finding no one at home, Fleming entered hoping to retrieve the weapon he had sold to Kight but, when it could not be found, he removed a television instead. A day or two later, he and Fleming made a purchase of heroin and, while it was still in their possession, they were stopped by two policemen. Taylor was told to leave, and Fleming was placed in a squadrol. Thereafter, Taylor observed Fleming converse with the policemen in the squadrol parked a short distance from the location where they had been stopped.

OPINION

Defendant first contends that the trial court erred in failing to ascertain the meaning of Juror Goss's unorthodox response and, in doing so, coerced her to accept a verdict which was not hers. We cannot agree.

■■■ In polling a jury, the trial court must fully examine those jurors whose responses indicate possible dissent from the verdict, and such examination must be conducted with a view toward ascertaining whether any juror had been coerced into accepting the verdict of the other jurors. (*People ex rel. Paul v. Harvey* (1972), 9 Ill. App. 3d 209, 292 N.E.2d 124.) However, as a juror's response need not be in any specific form, an unorthodox response of itself does not automatically cast doubt on the unanimity of the verdict. (*People v. Riddle* (1977), 49 Ill. App. 3d 46, 363 N.E.2d 881.) Moreover, further questioning to achieve a more orthodox answer does not require the court to specifically ask the juror to define his first unorthodox response so long as the juror is given the opportunity to disavow the verdict. (See *People v. Gardner* (1976), 40 Ill. App. 3d 700, 352 N.E.2d 448; *People v. Hill* (1973), 14 Ill. App. 3d 20, 302 N.E.2d 373.) Ultimately, the question of whether a juror's response to a poll of the jury indicates a lack of voluntary assent to the verdict is one for the trial court, which is in the best position to observe the juror's demeanor and tone of voice, and its determination should not be disturbed by a court of review unless it is clearly unreasonable. *People v. Herron* (1975), 30 Ill. App. 3d 788, 332 N.E.2d 623.

Here, the trial court rephrased its question twice, which gave Juror Goss two opportunities to disavow the verdict—which she did not do. Nevertheless, defendant, citing *Goshey v. Dunlap* (1973), 16 Ill. App. 3d 29, 305 N.E.2d 648, and *People ex rel. Paul v. Harvey*, argues that by not asking her to define her use of the term "compromise" and by polling the remaining jurors before examining her further, she was precluded from disavowing the verdict. In *Goshey*, during polling of the jurors, the court twice instructed them that when the name of each of them was called "he

should answer: '[t]his was and this is now my verdict.' " (16 Ill. App. 3d 29, 34, 305 N.E.2d 648, 652.) It was held that this form of polling totally failed to provide for the possibility of a juror's disagreement with the verdict. In *Harvey*, after a juror answered that it wasn't exactly her verdict, in response to the question of the court, she answered that she signed the verdict and the court stated "Then it's your verdict." (9 Ill. App. 3d 209, 210, 292 N.E.2d 124, 126.) No opportunity was given the juror to disavow the verdict. While we recognize the coercive influence in *Goshey* and *Harvey*, we do not view the trial court's procedure was improper here. We note that where a juror has expressed assent to the verdict, this court has not required exploration of unorthodox responses such as the following: "In a way I was [satisfied with the verdict] and in a way I wasn't" (*People v. Riddle*, 49 Ill. App. 3d 46, 48, 363 N.E.2d 881, 883); "I gave my verdict as not guilty, but there was certain points that I was not certain of, that I was * * * reluctant, I should state" (*People v. Gardner*, 40 Ill. App. 3d 700, 702, 352 N.E.2d 448, 449); and in *People v. Massie* (1972), 5 Ill. App. 3d 432, 283 N.E.2d 293, where when asked whether it was and is his verdict, a juror answered "I pleaded guilty, yes."

■■ Thus, where the trial court, as here, asks open-ended questions to which the juror may assent or dissent from the verdict, we conclude that it is not unreasonable for a court to find a voluntary assent (*Herron*) and that in the instant case it was not necessary for the court to go further and extract a definition or explanation of the use of the juror's terminology in her initial unorthodox response.

Turning to the consideration of the trial court's determination of unanimity, we note that it was in a superior position to observe the demeanor of Juror Goss and her manner of response, and because our review of the record reveals no factor showing its decision to be clearly unreasonable, we cannot say that it erred in accepting the verdict as unanimous.

Defendant next contends that we should consider Juror Goss's affidavit on the question of coercion. In this regard, we note that jurors cannot by affidavit impeach their verdict. (*People v. Stacey* (1962), 25 Ill. 2d 258, 184 N.E.2d 866, *cert. denied* (1963), 371 U.S. 964, 9 L. Ed. 2d 511, 83 S. Ct. 546, *overruled on other grounds, People v. Nunn* (1973), 55 Ill. 2d 344, 304 N.E.2d 81, *cert. denied* (1974), 416 U.S. 904, 40 L. Ed. 2d 108, 94 S. Ct. 1608.)

"[N]o case can be found, where the jurors, after having consented to the verdict, have been permitted, afterwards, for the purpose of setting it aside, to explain by affidavits, the ground, or train of reasoning by which they arrived at the result. This would be a very dangerous practice, as it would create a strong temptation in the

losing party to tamper with the jurors, and thus procure their after thoughts, produced by intercourse with the party, to be imposed upon the court, for their opinions in the jury room." (*Smith v. Eames* (1841), 4 Ill. (3 Scam.) 87, 81.)

However, affidavits have been considered to the extent that they relate allegedly coercive communications to jurors by the court or third parties outside of the presence of the accused. *People v. Tobe* (1971), 49 Ill. 2d 538, 276 N.E.2d 294.

■■ Here, a portion of the affidavit concerned Juror Goss's memory of the colloquy between the trial court and herself wherein she claimed the court foreclosed her opportunity to dissent. As this exchange occurred in open court and in the presence of defendant, it falls without the *Tobe* exception. This portion and the remainder of the affidavit concern certain circumstances such as her physical discomfort, her desire to go home, and the unspecified remarks of fellow jurors attempting to convince her that defendant was guilty of murder. These are the grounds and reasons by which she arrived at the verdict to which she assented in open court and, as such, are precisely the form of impeachment for which *Smith v. Eames* prohibited the use of affidavits. Defendant, nonetheless, relies upon the following language also taken from that opinion "[jurors may not impeach their verdict by affidavit except] where a part of them swear that they never consented to any verdict." (4 Ill. (3 Scam.) 76, 81.) He reasons that the affidavit here does not impeach the verdict but, rather, establishes that Juror Goss did not consent to a verdict and, as a result, there never was a unanimous verdict. Thus, he argues, her affidavit falls within the exception. We believe, however, that such reasoning misconstrues the meaning of the term impeachment, as whenever by a juror's affidavit a party seeks to overturn a verdict, such affidavit by its very nature would attempt to show that the verdict had in some manner or fashion not achieved unanimity. While the parameters of the exception upon which defendant relies are unclear from our reading of *Smith v. Eames*, it is our opinion that the facts before us fall with its general rule making the exception unavailable to defendant. For the reasons stated, we do not believe any portion of Juror Goss's affidavit may be considered on the question of coercion.

Defendant next contends that he was denied a fair trial in that an improper deadlock instruction was given prematurely by the trial court.

In *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731, the supreme court disapproved the instruction given here because it informed the jury that should they fail to reach a verdict, another jury would have to decide the case and that there is no reason to expect that the evidence on retrial would be clearer or that the next jury would be better able to decide the

matter, but the court expressly found that the instruction was not prejudicial as it did not suggest that the minority defer to the majority opinion. The court, under its supervisory power, then directed that future deadlock instructions comply with American Bar Association Minimum Standards Relating to Jury Trials (Standards Relating to Trial by Jury, Tentative Draft, May, 1968, pages 154 through 156) and suggested the following illustration:

> "The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

> You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case."

(53 Ill. 2d 62, 75-76, 289 N.E.2d 601, 609.)

We note, however, that continued use of the instruction criticized rather than the one suggested in *Prim* has not been viewed by this court as prejudicial (*People v. Longstreet* (1974), 23 Ill. App. 3d 874, 320 N.E.2d 529; *People v. Hairston* (1973), 10 Ill. App. 3d 678, 294 N.E.2d 748), but marked impatience with such a practice has been noted (*People v. Brown* (1977), 48 Ill. App. 3d 632, 362 N.E.2d 820; *People v. Jackson* (1975), 26 Ill. App. 3d 618, 325 N.E.2d 450).

It has, however, been held improper to prematurely give the deadlock instruction. (*Jackson*; see *United States v. Contreras* (9th Cir. 1972), 463 F.2d 773.) In this regard, two elements must be considered; *i.e.*, the length of deliberations and the ability to reach a verdict. As to the first of these, it was said in *People v. Daily* (1968), 41 Ill. 2d 116, 121, 242 N.E.2d 170, 173, *cert. denied* (1969), 395 U.S. 966, 23 L. Ed. 2d 752, 89 S. Ct. 2112:

> "The length of jury deliberations is a matter which rests within the sound discretion of the trial court and its judgment in this regard will not be disturbed unless this discretion has been clearly abused. [Citation.]"

Concerning the second element, it has been held that a deadlock instruction is improper where the foreman states unequivocally that the jury can reach a verdict (*Jackson*), but the following responses have been

considered sufficient to support the giving of a deadlock instruction: In *People v. Prim,* "I think there is a chance [to arrive at a verdict], Sir" (53 Ill. 2d 62, 71, 289 N.E.2d 601, 607); in *People v. Brown* "Not [able to reach a verdict] at this moment" (48 Ill. App. 3d 632, 633, 362 N.E.2d 820, 821); and "Some of the people feel there is [a possibility of reaching a verdict] and some feel there isn't" (*People v. Anthony* (1975), 30 Ill. App. 3d 464, 466, 334 N.E.2d 208, 209).

■■■ In the instant case, the instruction criticized in *Prim* was given. While we strongly disapprove such disregard of the supreme court's directive, we must agree with the State, as we did in *Longstreet* and *Hairston,* that an instruction which does not direct the minority to heed the opinion of the majority does not result in prejudice to the accused. Turning to the question of its timeliness, the record reveals that the jury was deliberating for 6½ hours and when called in by the court the foreman stated, "I couldn't tell you [whether we are able to reach a verdict] at the moment, sir." This trial was relatively short with few witnesses and, as portrayed by the closing arguments of both sides, raised only one question; *i.e.,* whether or not Fleming's testimony was credible. Under the circumstances, we cannot say that the deadlock instruction was given prematurely. Accordingly, we do not believe that the trial court by giving this instruction denied defendant a fair trial.

Defendant next contends that prosecutorial argument which characterized the State's case as uncontradicted and undenied constituted impermissible comment on his failure to testify and, as such, denied him a fair trial. We disagree.

In *People v. Norman* (1963), 28 Ill. 2d 77, 190 N.E.2d 819, it was held that prosecutorial comment may call the jury's attention to the fact that the State's evidence was uncontradicted even where the accused was the only person who could have denied such evidence. (*People v. Mentola* (1971), 47 Ill. 2d 579, 268 N.E.2d 8; *People v. Jackson* (1969), 116 Ill. App. 2d 86, 253 N.E.2d 624.) In this regard, it has been said that "[a]lthough the prosecutor emphasized the uncontradicted character of the People's case, there was no evidence whatever presented by the defense, and statements pointing out the fact that the People's case was uncontradicted are not a reference to the failure of the defendant to testify* * *." (28 Ill. 2d 77, 81, 190 N.E.2d 819, 821-22.) It is possible, however, for the prosecutor to exceed this rule and actually comment upon the accused's silence and to ascertain whether the rule has been so violated the following test has been fashioned, "whether 'the reference [was] intended or calculated to direct attention of the jury to the defendant's neglect to avail himself of his legal right to testify?' " (*People v. Acker* (1970), 127 Ill. App. 2d 283, 292, 262 N.E.2d 247, 251.) Excesses have been found primarily in situations where the State's case has been contradicted to some extent by one or more

defense witness but defendant has not testified and the prosecutor calls the jury's attention to this deficiency in the defense's case. *People v. Wollenberg* (1967), 37 Ill. 2d 480, 229 N.E.2d 490; *People v. Martin* (1975), 29 Ill. App. 3d 825, 331 N.E.2d 311.

■■ Here, defendant claims that when the prosecutor characterized the State's case as uncontradicted and undenied, he exceeded permissible bounds because he turned to look at and pointed to defendant when they were made. Shortly after the close of the prosecutor's argument, defense counsel raised this contention to the trial court, which stated for the record, "I don't recall noting his pointing a finger or looking at the Defendant." On appeal, defendant relies on the statements of defense counsel that such behavior took place, but "the statements of counsel are not evidence and may not be used as a vehicle for attempted expansion of the record." (*People v. Smith* (1977), 53 Ill. App. 3d 395, 407, 368 N.E.2d 561, 570.) Our review of the record reveals that the comment was not calculated to single out defendant's failure to testify but, rather, simply stated the obvious; *i.e.*, that the defense rested at the close of the State's case. Therefore, we cannot say that prosecutorial comment denied defendant a fair trial.

Defendant next contends that prosecutorial comment, whereby he was referred to as a dope addict, compounded the prejudicial effect of several questions intimating addiction, which constituted an impermissible use of past misconduct.

■■ Evidence of crimes or bad acts is inadmissible (*People v. Donaldson* (1956), 8 Ill. 2d 510, 134 N.E.2d 776), unless it is so closely connected with the main issue that it tends to prove defendant guilty of the offense charged (*People v. Durso* (1968), 40 Ill. 2d 242, 239 N.E.2d 842, *cert. denied* (1969), 393 U.S. 1111, 21 L. Ed. 2d 807, 89 S. Ct. 923). Moreover, evidence of bad acts may be admitted and commented upon where defendant volunteers the information or fails to object to the State's questions which elicit such information. See *People v. Miller* (1958), 13 Ill. 2d 84, 148 N.E.2d 455, *cert. denied* (1958), 357 U.S. 943, 2 L. Ed. 2d 1556, 78 S. Ct. 1394.

Although an error is generally deemed to be cured where the defense objections have been sustained during the course of trial and where the jury is instructed to disregard the matter (*People v. D'Argento* (1969), 106 Ill. App. 2d 36, 245 N.E.2d 501), evidence of unrelated misconduct or crimes and comment thereon may be so highly inflammatory that such rulings may fail to effect a cure (*People v. Deal* (1934), 357 Ill. 634, 192 N.E. 649).

■■ Where evidence of prior criminality or bad acts are properly admitted, the general guidelines as to comment thereon are expressed in *People v. Miller* as follows:

"Statements of counsel and argument based upon facts and circumstances proved, or upon legitimate inference therefrom, do not exceed the bounds of proper debate and are not to be discountenanced by the courts. [Citation.] It is not improper for the prosecuting attorney to reflect unfavorably on the defendant, or to comment on his actions, if based on competent and pertinent evidence. [Citations.] Similarly the State's Attorney has a right to dwell on the evil results of crime and to urge fearless administration of the law. [Citation.]" (13 Ill. 2d 84, 109, 148 N.E.2d 455, 468-69.)

Furthermore, where it does not appear that the remarks complained of influenced the jury in a manner that resulted in substantial prejudice to the accused, reversal is unwarranted. *People v. Stahl* (1962), 26 Ill. 2d 403, 186 N.E.2d 349; *People v. Bell* (1975), 27 Ill. App. 3d 171, 326 N.E.2d 507.

■■■ Here, Fleming testified without objection that defendant, after selling Pope's gun to Kight, used a portion of the proceeds to purchase heroin and then transported the contraband back to Fleming's house, where they both "shot up." In closing argument, the prosecutor summarized this testimony and inferred from it that defendant was a dope addict. During oral argument before this court, defendant conceded that such evidence was properly admitted and that the above comment was a legitimate inference. Nonetheless, he argued that the prosecutor's six separate attempts to elicit testimony regarding defendant's use of dope on unrelated occasions was a calculated attempt to compromise his character in the eyes of the jurors. On four of these occasions, the trial court sustained defense objections before the witness answered, and on the two remaining occasions directed the jury to disregard the responses. While we agree that such conduct is to be criticized, particularly in light of the trial court's reprimands and, while we think the sustaining of the objections and the directions to disregard the responses alone would not necessarily cure repeated prosecutorial misconduct, we do not believe the attempts to elicit unrelated use of heroin prejudiced defendant beyond that resulting from the revelation of his single related use, as this implied use on other occasions. Moreover, it was the argument of defense counsel which injected and focused attention upon the propensity of dope addicts to commit crime to maintain their expensive habit. In the light thereof, our review of the record as a whole fails to disclose that defendant was denied a fair trial by prosecutorial misconduct.

Defendant also urges that the trial court erred in failing to poll the jury concerning two possibly prejudicial influences. It is his position that where one of the jurors in the presence of the other jurors asked that the murder weapon be turned away from pointing in her direction as it lay on the defense table, and where an alleged newspaper article noting the

number of handguns used in committing homicides may have come to the jury's attention during the course of the trial, he was denied a fair trial by the court's failure to question the jurors concerning their possible prejudicial effect.

■■ Whether a jury should be interrogated concerning a given newspaper article is a matter for the sound discretion of the trial court, and it is the abuse of such discretion rather than the refusal to interrogate which constitutes error. (*People v. Heller* (1971), 131 Ill. App. 2d 799, 267 N.E.2d 685.) As stated in *People v. Cox* (1966), 74 Ill. App. 2d 342, 347, 220 N.E.2d 7, 10:

> "[N]ot * * * every newspaper article published during trial requires an interrogation of the jury. Its nature, content and prejudicial effect, if any, is to be resolved by the trial court in an exercise of sound discretion. The article must be produced and made a part of the record and its prejudicial effect, if any, first carefully explored by the trial court."

Articles which are general in nature and refer to a general class of offenders but not specifically to the accused are not prejudicial per se to defendants who happen to be on trial for the conduct targeted by the column. (*People v. Krueger* (1968), 99 Ill. App. 2d 431, 241 N.E.2d 707.) The prejudicial effect of an article cannot be considered absent a motion to admit it or an affidavit outlining its contents into evidence; accordingly, an allegation of prejudice is insufficiently shown if supported only by the unsworn statement of defense counsel as to the contents. *People v. Hill* (1975), 34 Ill. App. 3d 193, 339 N.E.2d 405.

■■■ Here, the only showing that the article might have prejudiced the jurors was based upon the unsworn summary given by defense counsel. This summary revealed that the article was general in nature, with no allegation that any reference was made to defendant or to the murder of Pope. Under the circumstances, we are unable to determine whether the trial court abused its discretion in failing to interrogate the jury concerning the article and must assume that the trial court ruled correctly. Concerning the incident wherein a juror requested that the gun left on the table be turned away from pointing toward her because guns made her nervous, we do not believe such conduct required the juror's interrogation, as they treated the entire affair lightheartedly and the expressed fear was of guns generally. Under such circumstances, we see no error in failing to poll the jury in relation to either matter.

■■ Turning then to defendant's contention that his sentence for murder was excessive, we note that the authority to reduce a sentence should be applied by a court of review with great circumspection and caution, as the trial court is in a superior position during the course of the trial and the hearing in aggravation and mitigation to make a sound

determination regarding punishment. (*People v. Taylor* (1965), 33 Ill. 2d 417, 211 N.E.2d 673.) A sentence is proper if within legislative limitations and, absent a great departure from the fundamental purpose and spirit of the law, it will not be disturbed. (*People v. Stephens* (1974), 18 Ill. App. 3d 971, 310 N.E.2d 824.) The trial court having regard for the nature and circumstances of the offense as well as the history and character of the accused, may impose a minimum term in excess of 14 years for murder. (Ill. Rev. Stat. 1975, ch. 38, pars. 9—1, 1005—8—1(c)(1).) To ascertain whether a higher minimum sentence is proper, the reviewing court may look to the statement of the trial court at the time of sentencing as well as the record as a whole (*People v. Taylor* (1974), 25 Ill. App. 3d 396, 323 N.E.2d 388), including but not limited to the presentence report (*People v. Cook* (1975), 31 Ill. App. 3d 363, 334 N.E.2d 834), the police report of prior convictions (*People v. Dennis* (1970), 47 Ill. 2d 120, 265 N.E.2d 385, *cert. denied* (1971), 403 U.S. 907, 29 L. Ed. 2d 683, 91 S. Ct. 2212), and the nature and circumstances of the offense (*People v. Parker* (1976), 40 Ill. App. 3d 597, 352 N.E.2d 394; *People v. Collins* (1976), 36 Ill. App. 3d 269, 343 N.E.2d 550).

● 16    In the case at bar, the murder was committed after defendant had disarmed the victim and had apparently obtained the proceeds of the robbery. Moreover, he had previously been convicted of aggravated assault, resisting arrest, disorderly conduct, and armed robbery. He argues, however, that because he was 24 years old at the time of trial, the lengthy sentence which he received was not conducive to his rehabilitation. As the record disclosed an act of senseless violence, and as some of his prior offenses indicate a proclivity for violent antisocial behavior, we cannot say that the sentence imposed in this case represents a departure from the fundamental purpose and spirit of the law, and consequently it will not be disturbed.

For the reasons stated, the judgment appealed from is affirmed.

Regarding the denial of defendant's post-conviction petition without an evidentiary hearing, he contends that his petition and supporting affidavits raised substantial constitutional violations; *i.e.*, his conviction was based upon perjured testimony, evidence favorable to the defense was suppressed by the State, and he was denied the right of confrontation. We are in partial agreement, as will be disclosed below.

Only where the post-conviction petition makes a substantial showing of a constitutional violation is the trial court required to hold an evidentiary hearing and conclusionary allegations do not constitute such a showing. *People v. Jones* (1977), 66 Ill. 2d 152, 361 N.E.2d 1104.

■■    Regarding defendant's first assignment of constitutional violation, it is generally recognized that the prosecution's use of testimony known to be false is a practice so lacking in fundamental fairness that the accused is

deprived of due process of law. (*Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173.) The knowledge of its agents, whether they be prosecutors or law enforcement officers, is chargeable to the State, and the perjured testimony need not relate to a material issue as due process is likewise denied where falsity occurs in testimony going to the credibility of a witness. (*People v. Martin* (1974), 56 Ill. 2d 322, 307 N.E.2d 388; *People v. Martin* (1970), 46 Ill. 2d 565, 264 N.E.2d 147.) It has been held, however, that where the post-conviction petition fails to allege the State knowingly used false testimony, it is subject to dismissal without an evidentiary hearing. *People v. Frank* (1971), 48 Ill. 2d 500, 272 N.E.2d 25.

Defendant argues that *Frank* is distinguishable because the false testimony in that case did not, as he claims here, go to the heart of the State's case and he suggests that, in such circumstances, *People v. Sims* (1972), 4 Ill. App. 3d 878, 282 N.E.2d 16, and *People v. Shannon* (1975), 28 Ill. App. 3d 873, 329 N.E.2d 399, have abrogated the need to allege a "knowing use." In *Sims*, it was stated that "an allegation of a conviction founded upon perjured testimony, whether knowingly used or inadvertently used, is of constitutional dimension." (4 Ill. App. 3d 878, 880, 282 N.E.2d 16, 18.) In *Shannon*, the petitioner did not allege that perjured testimony was knowingly used by the State, and the court applied the more expansive definition of State action announced in *Shelley v. Kraemer* (1948), 334 U.S. 1, 92 L. Ed. 1161, 68 S. Ct. 836, and held that an alternative theory existed by which a constitutional violation may be alleged; *i.e.*, "the use of the State's judicial process to enforce a right of the People, the violation of which is based upon the perjured testimony of a private individual, constitutes State action whether or not the State knew that the testimony was perjured." (28 Ill. App. 3d 873, 878, 329 N.E.2d 399, 404.) While we find this reasoning sound, we disagree with the dicta appearing in *Shannon* applying the rule announced in *People v. Bracey* (1972), 51 Ill. 2d 514, 520, 283 N.E.2d 685, 690, that "[o]nce the condemned use of perjured testimony has been established, *Chapman* [*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824] dictated that the burden then be placed on the State to establish beyond a reasonable doubt that the perjured testimony did not contribute to the conviction." It appears to us that proving such "testimony did not contribute to the conviction" is practically an impossibility where a defendant has already established the allegation that his conviction was "based upon perjured testimony." In any event, while *Shannon* relieves the accused of the burden of pleading and proving that the State *knew* the testimony was perjured, it simultaneously substitutes the heavy burden of pleading and proving that his conviction was *based* upon perjured testimony. However, from the view defendant

takes of *Frank*, he has apparently accepted such a burden if allowed to employ the alternative theory of *Shannon*.

■■ Fleming testified at trial that defendant on April 8, at approximately 10:15 p.m., arrived at the former's house with a .38-caliber gun, which was later identified as the murder weapon, and that defendant said he shot Pope. Shortly thereafter, he went with defendant when the latter sold the murder weapon to Kight for $40 but received less than this amount and was told to return another time for the balance. Taylor's affidavit stated that on April 9 or 10, it was Fleming who sought to sell a .38-caliber gun and that later the same day, Fleming told him that Kight had purchased the gun for $40, paying only a portion of the purchase price with the balance to be paid on another day. While we agree with the State that it was not established that the .38-caliber gun to which Taylor referred was the murder weapon, we believe the facts of the sale as described by Fleming and Taylor are sufficiently similar in detail to support the conclusionary allegation of perjury even though the gun's identity may be difficult to prove at an evidentiary hearing. Further, inasmuch as it was Fleming's testimony of defendant's recent possession of the murder weapon and the latter's admission of guilt to Fleming which formed the basis of the conviction, it is our opinion that the petition was improperly denied in the absence of an evidentiary hearing.

Defendant's second assignment of constitutional violation is raised by the allegation that the State, irrespective of the good or bad faith of the prosecutor, suppressed evidence favorable to the accused where such evidence is material either to guilt or punishment. In *United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392, the burden of showing materiality where the defense has not specifically requested the omitted matter was defined as follows:

> "The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." (427 U.S. 97, 112-13, 49 L. Ed. 2d 342, 354-54, 96 S. Ct. 2392, 2401—02.)

The issue then is as expressed in *People v. Jones* (1977), 66 Ill. 2d 152, 161,

361 N.E.2d 1104, 1108, "whether [the omitted evidence] 'evaluated in the context of the entire record' creates a reasonable doubt of the defendant's guilt that did not otherwise exist."

Here, Fleming testified that he was not offered and did not receive favorable treatment from the police in exchange for his testimony against defendant. During the course of the trial, defense counsel elicited that Fleming was arrested immediately after purchasing heroin; that according to Fleming the arresting officer testified that the contraband was not found on him; and that Fleming was in police custody for several hours before implicating defendant. Taylor's affidavit added that he was with Fleming when stopped by police; the police told him to leave while immediately placing Fleming in the squadrol; and the next day Fleming announced that he was not going to jail for anyone and that he had an armed robbery charge he was going to beat. Defendant concludes that a deal was made in exchange for Fleming's testimony and that evidence of it was withheld from the defense. We must disagree with his conclusion for several reasons.

■■ First, if we are to enter the realm of speculation, we believe that Taylor's affidavit also infers the absence of a deal because since no probable cause for his stop, arrest and search is indicated, the arresting officer could not constitutionally testify that contraband was found in Fleming's possession. *Chimel v. California* (1969), 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034; *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.

Second, while Fleming's statement that he would go to jail for no one and that he had an armed robbery charge to beat could support defendant's speculation of the existence of a deal, it is equally supportive of the speculation that Fleming feared the police suspected that he may have aided and abetted defendant because he shared in the proceeds of the sale of Pope's gun. If the police ever indicated an intent to charge Fleming on an accountability theory, the fact that they did not do so is just as indicative of a failure to discover evidence of actual aiding and abetting the robbery and murder of Pope as it is of the existence of a deal.

■■ Third, the affidavit raises no greater inference of a deal than did the evidence adduced at trial; therefore, we believe the petitioner has failed to sufficiently allege that the State suppressed evidence which, if evaluated in the context of the entire record, would create an otherwise nonexistent reasonable doubt of guilt. *Jones.*

In his final assignment of constitutional violation, defendant asserts that his cross-examination of Fleming was limited by the State's suppression of evidence of a deal in exchange for his testimony. This assertion must be rejected, however, in view of our belief, as expressed above, that the evidence does not sufficiently establish such a deal.

Summarizing, we conclude that the trial court erred in denying the petition without an evidentiary hearing as to the allegation that defendant's conviction was based upon perjured testimony, but not in regard to the suppression of favorable evidence or as to the denial of the right of confrontation.

For the reasons stated, the judgment in the direct appeal is affirmed, but the judgment in the appeal from the denial of the post-conviction petition is reversed and that cause is remanded with directions to hold an evidentiary hearing consistent with the content of this opinion.

In 62547 the judgment is affirmed.

In 77-735 the judgment is reversed and remanded with directions.

LORENZ and WILSON, JJ., concur.