THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROY BOLL, Defendant-Appellant.

First District (4th Division)    No. 77-1281

Opinion filed December 7, 1978.

---

James J. Doherty, Public Defender, of Chicago (James L. Rhodes, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and James S. Veldman, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

Following a jury trial the defendant, Roy Boll, was convicted of armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2), and was sentenced to a term of four years to four years and one day. On appeal he raises three contentions: (1) his guilt was not established beyond a reasonable doubt; (2) the jury was given an improper instruction on their deadlocked condition; (3) the trial court erred in refusing to give defendant's proposed instruction on admissions.

We affirm the judgment of the trial court.

The victim of the robbery, James Poe, testified at trial that on October 23, 1975, he visited some friends in an apartment building located at 43rd Street and King Drive in Chicago. Poe remained in the apartment from 8:30 p.m. till midnight, during which time he had approximately three alcoholic drinks. Poe left about midnight and walked to a drugstore located on the northwest corner of 43rd and King Drive, where he intended to purchase a bottle of vodka. The store was closed, but Poe asked the maintenance man inside if he could still buy the bottle and the man walked into the back of the store. At that time Poe heard a voice behind him say "Let's have it." Poe turned around and saw a man whom he identified in court as the defendant standing one to two feet away from him. Poe also testified at trial that the lighting conditions, supplied by street lights, were "perfect." Poe asked defendant what he was talking about and defendant demanded Poe's money. A shorter man approached and held a knife with a six- to seven-inch blade against Poe's throat while defendant took Poe's wallet containing $20, $4 from his front pocket, and his wristwatch. The man with the knife took two $1 bills Poe had been holding to pay for the alcohol. Poe saw no other man, but heard a voice say "Let's split, here come the pigs." He then saw three men run north on King Drive for one-half block then west into a vacant lot, where

he lost sight of them. Poe flagged down a police car seconds after the robbery and informed the police what had happened. He got in the back seat of the car and the police drove west on 43rd to an alley located between King Drive and the next street west, Calumet. The police drove north up the alley and Poe saw three men standing in the alley whom he recognized and identified as his robbers. This occurred one to two minutes after he lost sight of them. The men then ran north towards 42nd Street until they reached a vacant lot between the alley and Calumet. At this point the defendant and one other man ran north on Calumet, the third man ran south. The two police officers stopped the car in the lot and split up to chase the three men while Poe remained in the car. Five to six minutes later one officer returned with the defendant and the man who had held the knife. On cross-examination Poe could not recall the clothing worn by the men who robbed him, except that the clothing was dark. He also testified that he did not give the police a description of the men when he flagged them down.

The two police officers involved in the chase, Thomas Martin and Donald Richardson, also testified at trial. They recalled that the three men in the alley were in a huddle facing each other with their backs to the officers. When Poe saw them he said "There they are" or "That's them." Officer Richardson recalled that the alley was "well lit." Officer Martin chased the two men running north to the area of 41st Street and Calumet, where he lost sight of them for one second when they went into a doorway. Martin followed, joined by another officer who had arrived on the scene. He found the defendant hiding behind the door with a knife with a four-inch blade in one hand and $2 in the other hand. (The knife was destroyed prior to trial.) The second man was also there, and Martin took them both back to the squad car. Defendant gave his name as Floyd Davis and his age as 16, stating that he was born December 30, 1958. Both officers testified that Poe was sober that night.

Investigator Robert Utter testified that he questioned the defendant intermittently during a 1½- to 2-hour period that night at the police station. The questioning was not continuous because Utter was also involved in other matters in the office during that period of time. The defendant had one hand handcuffed to his chair during the questioning. Utter advised him of his constitutional rights and defendant said he understood them. He first gave his name as Floyd Davis, but later gave his correct name. Defendant initially told Utter that he was present when some boys robbed a man, but that he did not "jump in." However, later in the questioning Utter asked defendant why Poe would lie about his involvement. Utter recalled that defendant then responded: "Fuck it. I am the guy. I went in his pocket. I was there. Yes, I went in his pockets. I don't want to say no more." This statement was not reduced to writing,

although Utter did state in his supplementary report typed that night that defendant had orally admitted his participation in the crime.

It was stipulated between the parties that on the date of the offense the defendant was 17 years of age and that he was 19 at the time of trial. (Subsequently the defendant testified that he was 18 at the time of the offense and his birthdate was July 12, 1957, which would have made him 19 at the time of trial.)

Testifying in his own behalf, defendant stated that from nine p.m. to midnight that evening he and Dexter Clemons were visiting two girls at 42nd and Calumet. Defendant and Clemons then began to walk home, going north on Calumet. Two police cars drove up and the two were ordered to get up against the wall and were patted down. The police recovered $2 from defendant's pockets and a "little pocket knife" from Clemons' pockets. He was transported down the street where Poe identified him, but at the time Poe was "wobbling," his eyes were red, his speech was slurred, there was liquor on his breath, and defendant concluded that he was drunk. Defendant denied any involvement in the robbery. He testified that he was never told his constitutional rights, he never told the police he was present at the robbery but did not participate, and he never admitted that he had robbed Poe. Defendant did concede that he had lied to the police about his name and age but explained that he did so because he was frightened.

Investigator Utter testified in rebuttal that he had observed Poe that night, and Poe walked normally, his eyes were not bloodshot, and he smelled no alcohol on Poe's breath.

I.

■■ From this summary of the evidence it is clear that there was ample support for the jury's verdict. The victim testified that he viewed the defendant at the time of the robbery under street lighting conditions he described as "perfect." The defendant was apprehended a few blocks from the robbery scene within 10 minutes after the victim had spotted him in an alley and identified him to the police. According to police testimony, the defendant admitted his presence at the robbery when he was first questioned, and subsequently admitted that he had participated in the robbery. Defendant's trial testimony contradicting these matters presented a question of credibility for the jury. Their resolution of this question in favor of the State's witnesses was a reasonable one; it certainly was not so improbable as to raise a reasonable doubt of defendant's guilt and therefore we will not disturb that determination on review. *People v. Blakely* (1977), 50 Ill. App. 3d 536, 365 N.E.2d 996; *People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666; *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.

## II.

■■ Defendant also maintains that the trial court committed reversible error in its supplementary instruction to the jury. After the jury had deliberated for a period of time, the length of which is not set forth in the record, they returned to open court where the following occurred:

> "The Court: Would the foreman please stand? Have you reached a verdict?
>
> Foreman: No, your honor, we have not.
>
> The Court: Is it your contention you are unable to reach a verdict or what?
>
> Foreman: At this time we cannot reach a verdict.
>
> The Court: At this time is there any indication that further deliberation might result in a verdict?
>
> Foreman: I don't believe so, your honor.
>
> The Court: This hasn't been a lengthy case. I am going to send you back to deliberate. I just want you to know that in a large portion of cases absolute certainty cannot be expected. Although the verdict must be the verdict of each individual juror and not a mere acquiescence of conclusion of others, yet you must examine the question submitted with proper regard and deference to the opinion of each other and you should listen to each other's opinions with the disposition to be convinced.
>
> It is your duty to decide the case if you can conscientiously do so. If you should fail to agree on a verdict this case must be retried and a future jury must be selected in the same manner and same source which you have been chosen.
>
> There is no reason to believe that the case would ever be submitted to twelve men and women more competent to decide. Nor can the case be tried any better or more exhaustively than it has been here or that more clear evidence can be produced on either side.
>
> Now you can retire and consider the verdict in this case."

Defendant correctly notes that nearly identical language in a supplementary instruction was criticized in *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731. The court in *Prim* first considered whether *any* supplementary instructions should be given to deadlocked juries. It noted that the criticism of such "Allen charges" (*Allen v. United States* (1896), 164 U.S. 492, 41 L. Ed. 528, 17 S. Ct. 154) generally focussed on that portion which urged jurors dissenting from a majority position of the jury to reconsider their opinion in the light of the position of these other jurors. (See *People v. Richards* (1968), 95 Ill. App. 2d 430, 237 N.E.2d 848.) Despite the danger of jury coercion, the court determined that the jury should be instructed when they could not reach agreement. Accordingly,

the court adopted an instruction which it felt was in compliance with established American Bar Association standards. (ABA Standards Relating to Trial by Jury 145-56 (Tent. Draft May 1968).) Those standards, and the instruction derived from them by the court, were set out in full in *Prim*. The court directed trial courts in Illinois to comply with these standards. In the light of this clear directive and the fact that a complete instruction has been developed by our supreme court, we are puzzled by the number of instances in which this court has been forced to review the prejudicial effect of instructions given subsequent to the issuance of the *Prim* opinion which are based on what was expressly disapproved in *Prim*. Nonetheless, we note that the court in *Prim* specifically determined that the instruction they were reviewing, which was virtually identical to that given in this cause, was not prejudicially coercive in that it did not interfere with the deliberations of the jurors nor did it hasten their verdict. While the language was deemed not helpful and even erroneous insofar as it instructed the jury that their failure to agree would automatically require retrial, the error was held not to be prejudicial and thus did not require reversal. The instruction before us, like that reviewed in *Prim*, does not include the language deemed to be coercive of jurors whose opinions are in the minority. Accordingly, we find no prejudice arising from the instruction.[1] *People v. Preston* (1978), 60 Ill. App. 3d 162, 376 N.E.2d 299; *People v. Longstreet* (1974), 23 Ill. App. 3d 874, 320 N.E.2d 529; *People v. Hairston* (1973), 10 Ill. App. 3d 678, 294 N.E.2d 748.

## III.

■ Finally, defendant claims error in the failure of the trial court to give his proposed instruction on admissions. Defendant did not object when the State proposed the giving of the IPI instruction:

"You have before you the evidence that the defendant made an admission of a fact or facts relating to the crime charged in the indictment.

It is for you to determine whether the defendant made the admission, and, if so what weight should be given to the admission. In determining the weight to be given to an admission, you should consider all of the circumstances under which it was made." (Illinois Pattern Jury Instructions, Criminal, No. 3.06 (2d Ed. 1971).)

And that instruction was given to the jury. However, after the court accepted this instruction defendant offered Federal Pattern Instruction No. 72.12:

---

[1] This practice of brinkmanship should be discouraged. We must caution that by a continued persistence in entering into the realm of the forbidden, a trial court travels at its own risk, to the very brink of reversible error.

"Evidence as to any oral admissions, claimed to have been made outside of court by a party to any case, should always be considered with caution and weighed with great care. The person making the alleged admission may have been mistaken, or may not have expressed clearly the meaning intended; or the witness testifying to an alleged admission may have misunderstood, or may have misquoted what was actually said.

However, when an oral admission made outside of court is proved by reliable evidence, such an admission may be treated as trustworthy, and should be considered along with all other evidence in the case." (2 Devitt & Blackman, Federal Jury Practice and Instructions §72.12 (3d ed. 1977).)

Defendant contends that this instruction should have been given because the defendant's oral admission was ambiguous. Specifically, he claims that it could have simply been a result of defendant's exasperation with having been interrogated for several hours while handcuffed to his chair. Or alternatively, defendant contends the investigator could have misinterpreted what was actually a mere repetition of his accusations by the defendant. We find no merit in these theories. Defendant's statement was unequivocal and unambiguous. The IPI instruction fully and completely informed the jury of their responsibility to evaluate the weight to be given to the admission and also to determine whether it was even made. It was properly given without modification. *People v. Malone* (1976), 37 Ill. App. 3d 185, 345 N.E.2d 801.

For the foregoing reasons the judgment of the trial court is affirmed.

Affirmed.

JOHNSON, P. J., and LINN, J., concur.

