THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARRYL MOORE, Defendant-Appellant.

First District (6th Division)   No. 1—87—2604

Opinion filed June 1, 1990.

Darryl Moore, of Menard, appellant *pro se.*

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Kenneth T. McCurry and David R. Butzen, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE LaPORTA delivered the opinion of the court:

Defendant was charged in a 13-count information with six counts of aggravated criminal sexual assault, one count of criminal sexual assault, one count of robbery, three counts of aggravated kidnapping, one count of kidnapping, and one count of unlawful restraint. After a jury trial in which the defendant appeared *pro se*, he was found guilty

of all charges. Defendant's motion for a new trial and writ of error were denied. After a sentencing hearing, the defendant was sentenced to concurrent terms of 60 years for aggravated criminal sexual assault, seven years for robbery, and 15 years for aggravated kidnapping. He appeals, and we affirm for the reasons stated.

In his appeal, defendant raises 21 issues, many of which are related or repetitive and so have been combined in this opinion. Defendant argues that the trial court committed reversible error by (1) not granting defendant's motion to dismiss, which alleged that the information had been brought about through prosecutorial misconduct; (2) allowing discovery violations to occur which denied him access to necessary documents and information material to his defense; (3) allowing the State to introduce perjured and unsupported testimony; (4) not compelling the production of witnesses; (5) not recusing itself from the case; (6) allowing the State to bolster the victim's testimony by use of a prior consistent statement and by the testimony of other witnesses; (7) improperly questioning a witness on the stand; (8) allowing a portion of the trial to be recorded and broadcast by the news media; (9) allowing false photographs which did not accurately depict the site of the alleged attack to be admitted into evidence and published to the jury; (10) allowing expert testimony not based upon facts in evidence; and (11) giving jury instructions which were erroneous, confusing, and did not accurately state the law. Defendant also argues that the sentence was improper.

The defendant did not testify at trial, concentrating instead on disproving the testimony of the State's witnesses by cross-examining them and by the testimony of his witnesses.

The first person to testify was the 11-year-old victim. She testified that on the evening of February 13, 1987, her mother had given her $10 to go to a local sandwich shop for dinner, and that as she walked under a viaduct towards the shop, she was approached by a man, whom she identified as the defendant, who showed her a gun and asked if she knew anybody who wanted to buy a gun. The victim did not answer and tried to walk away, but the man grabbed her, pulled her into an alley, pushed her down beside a garage, removed her pants and underpants, removed his sweatpants, pulled his penis through the opening in his boxer shorts, and inserted his penis in her vagina. She testified that the $10 bill she had been given by her mother fell out of her pocket, and although she reached for it, the defendant took it. After a "couple of minutes," during which he kept his hand over the victim's mouth, the defendant removed his penis and moved away from the victim, who was

able to stand, dress herself, and run home.

When the victim arrived home, she told her mother what had happened, and her mother told the victim's brother to call the police while she, the victim, and a neighbor retraced the victim's route in an effort to find the attacker. When they returned home a few minutes later a police car with two officers waited. The victim got into the squadrol and spoke to the officers while her mother went upstairs briefly, then the victim directed the officers to the scene of the attack. Afterwards the officers drove the victim to the hospital, where she was examined, and then was taken home.

The next morning, the victim and her mother went to the police station, where she spoke with various officers and an assistant State's Attorney. The victim and her mother viewed a lineup of five men, and the victim identified the defendant as her attacker. The victim marked the defendant on a photograph of the lineup, and stated that she identified him by his sweatpants and by the scars on his face. She also identified her underpants, which had been taken at the hospital for use as evidence, and identified a series of photographs of her route to the sandwich shop and the scene, testifying that the photographs were a true and accurate representation of the area.

During his cross-examination, the defendant raised discrepancies between the victim's trial testimony that she had told the emergency room nurse that she was raped by a man with a gun, and police and medical reports which he said reflected no such information. When the victim insisted that she had told the emergency room nurse, police officers, and others of the gun, the defendant stated that she was saying that because the State's Attorney had told her to lie. The defendant read part of the victim's preliminary hearing testimony which he said contradicted her trial testimony and proved that the State's Attorney had told the victim to lie. The victim testified that the information was hers and did not come from the State's Attorney.

The victim's mother testified that approximately 40 minutes after she gave the victim a $10 bill to go to the sandwich shop, the victim returned to the apartment "screaming and hollering" and told her mother that a man had attacked her. After telling her son to call the police, the mother took the victim and a neighbor along the victim's route in an attempt to find the attacker. At this time, the victim had not told her mother where the attack occurred or that the man had a gun.

When they returned home, the mother told the police that her daughter had been raped, and went upstairs to use the washroom. When she returned, the victim and the neighbor were seated in the police car, and the victim was telling the police officers what had hap-

pened. The victim described the man to the officers and directed them to the scene of the attack. The mother identified one of the photographs as a true and accurate depiction of the scene. The officers then took the victim and her mother to the hospital, where the victim was examined. The mother testified that she spoke to one doctor, who said that the victim was all right, but that she did not ask him whether the victim had been raped. One of the police officers came to the mother and told her that they had found someone who matched the victim's description and that they should come to the police station the next day to make an identification.

The next morning, a detective came to take the victim and her mother to the station, where they went into one little room and spoke to some detectives. The mother and victim then moved to another room where they viewed a lineup, and the victim identified the defendant as her attacker; at trial, the mother was asked by the attorney to mark the man her daughter identified on the lineup photograph. They then returned to the first room, where the victim was shown a gun, which she identified as the weapon the defendant had used during her attack. The assistant State's Attorney spoke to them briefly, and the victim and her mother returned home.

On cross-examination, the defendant focused on the description given by the victim to the police officers, asking how the victim had identified him if the clothing her attacker had worn was not the same as that the defendant had been wearing when he was arrested. The mother testified that the victim had identified the defendant by the scars on his face.

After the mother testified, the judge informed the jury that pursuant to the defendant's request they would be taken to view the scene of the attack. The defendant objected, claiming that the scene to which the jury was to be taken was not correct and arguing that there was no documentary evidence that the victim had taken the officers to the scene. The defendant's objections were overruled, with the trial judge noting that if evidence of a different site were revealed later in the trial, the jury would be taken to the other site. The judge informed the jury that news reporters would be at the scene but would be told to keep their distance. At the scene, the victim pointed out various areas she had described in her testimony.

The next day, the defendant moved for a mistrial because the case had been reported on the radio and in the newspapers. The trial judge asked for and reviewed the newspaper articles, then queried each juror in chambers, with the defendant present. Of the 12 jurors and 2 alternates, only one, an alternate, admitted having seen an article and

testified that he had stopped reading it when he realized that it was the case he was on. He assured the judge and the defendant that the little he had seen would not affect his judgment on the case, and that if it would, he would inform the court. A juror mentioned that "somebody" mentioned that a gang leader and drugs had been mentioned, but assured the court that she would remain unbiased, and the defendant asked her no questions.

Officer Joseph DeCarlo, one of the police officers who had been dispatched to the scene, testified that the mother had told him that her daughter had been raped. The officer asked the victim what had happened and asked for a description of the attacker. He then radioed a description of the attacker to all other cars in the vicinity.

The officer asked the victim to direct them to the scene and on a map of the area drew the route they took. He identified several photographs as the route and the scene, and stated that he did not know the exact address of the scene but made his best estimate based upon his knowledge of the street numbers and the placement of the house behind which the garage sat. At the scene they all got out, and the officer asked the mother to ask the victim whether she had been penetrated. When the victim answered affirmatively, they returned to the police car and went to the hospital; while there, the officer received a call that the offender had been apprehended. The officer spoke with the emergency room doctor who examined the victim, completed his report, and left to take a copy to the station before resuming his patrol.

The defendant asked the officer why he had not written in his report that the victim had taken them to the scene, to which the officer responded that the address was on the report and it was not important to state specifically that the victim had taken them there. The defendant focused on the fact that the report did not specifically state that the victim had taken the officers to the scene and accused the officer of lying. The officer testified in response to further questions that he was never told by hospital personnel that the victim had not been raped and that he was not contacted directly by a citizen but had been assigned to respond to the call by a police dispatcher.

Carolyn Dolan, the emergency room nurse on duty when the victim was brought in, testified that she spoke with the victim and wrote a report. She testified that the victim said she had hit her head when she was pushed to the ground and that she had been raped in an alley and gave the address of the site. The victim was given antibiotics and was examined by the emergency room doctor. The nurse was shown a Vitullo Evidence Collection Kit, which she identified as the one used

to collect samples from the victim, and identified the items contained therein.

The defendant focused on the location given by the victim and whether the victim had said her attacker had a gun, which the nurse could not recall. When asked, the nurse testified that the Vitullo Kit would not be given to the victim, but was used by the hospital to collect samples for the police crime laboratory to use. This evidence was not examined at the hospital.

Officer Robert Davie, a police evidence technician, testified that he went to the hospital on February 13, 1987, to pick up a Vitullo Kit, and identified the kit in evidence as the one he had collected. He testified that he had turned the sealed kit over to the Chicago police department's evidence and recovered property section. On cross-examination, the defendant asked the technician why he had not indicated on the receipt that he had picked up slides; the technician said that he had picked up a complete kit, which contained slides, and would only mark that he had taken slides if that was all he had been given, pursuant to the markings on the form.

After the jury left, the defendant renewed his arguments regarding the newspaper articles, stating that their portrayal of him as a convicted rapist, while accurate, implied a pattern to his actions, and that the articles were prejudicially sensationalistic. The defendant argued that while he had been convicted of rape many years before, there was a difference between having been convicted of one rape and being a convicted rapist. The court took the defendant's comments as a motion for mistrial and denied the motion. The defendant then moved for a change of venue based on prejudicial publicity, but the trial court pointed out that this can occur only before trial has begun and denied the motion. The defendant complained that the judge's rulings were improper and contrary to the law.

Dr. Earl Grubbs, the emergency room doctor on duty when the victim was brought to the hospital, testified regarding his examination and treatment of the victim. He said that he had been told that the victim was assaulted in an alley; that the assailant had used a gun; and that the victim had been pushed to the ground, bumped her head, and was vaginally raped. The doctor performed a general physical examination of the victim and a pelvic examination, both of which he described. The doctor took samples for the Vitullo Kit as well as a slide which he examined for the presence of spermatozoa, which he did not find. The doctor described his findings that the victim exhibited no signs of trauma and that her hymen was intact, which he stated did not mean that she had not had sexual intercourse.

The defendant focused on the physical examination. The doctor stated that his diagnosis was "possible rape" but that he could not say for certain whether the victim had been raped or not. He noted that although he found no signs of penetration, the victim did report being in pain.

Dr. Imre Fenyes, the hospital's director of cytology testified that on February 16, 1987, he examined three smears taken from the victim on February 13, noting that the delay was due to an intervening weekend and the time needed to prepare slides for viewing under a microscope. He testified that the slides revealed the presence of spermatozoa, which indicated that intercourse had occurred. Upon cross-examination by the defendant, Dr. Fenyes noted that viewing properly fixed and stained specimens was more reliable than viewing the wet, unstained specimen which had been used in the emergency room.

Officer Michael Glines testified that he heard a description of an offender wanted for aggravated criminal sexual assault on his radio at least four times during the evening of February 13, 1987. As he and his partner patrolled their area, they noticed a person walking westward as they drove east on Berwyn. The person matched the description they had heard over their radio, so the officers turned around, approached, and told the person to stop. A pat-down search revealed a weapon which the officer identified in court, and the suspect was arrested and taken into custody, then transported to the police station. Officer Glines spoke to Officer DeCarlo at the hospital to confirm the description, and when this was done, completed his paperwork and notified the violent crimes section that the suspect had been arrested.

On cross-examination, the defendant focused on the description of the offender which had been given out over the radio, reading from the front of a dispatch card which had been completed by the operator who received the emergency call. Officer Glines admitted that the minimal information on that card did not fit the defendant, but indicated that the description he had heard was more detailed. The defendant accused the officer of arresting him simply because he matched the gender and racial description given, and stated that the dispatch card proved that the officer was lying.

Detective Warren Gavin of the violent crimes section was assigned to perform the follow-up investigation. He reviewed the reports existing at the time and arranged for a lineup consisting of several persons, including the suspect, whom he identified as the defendant. At the lineup, the victim identified the defendant as the man who attacked her. Detective Gavin then took the victim into another room

and showed her the gun which had been recovered from the defendant, which she identified as the gun used in the attack. He identified the gun and identified the photographs of the lineup as true and accurate depictions.

On cross-examination, the detective said that when setting up a lineup, they would try to find persons as close in looks to the suspect physically as possible, and admitted that those in the lineup were not very close to the defendant in build and none wore the same clothing he did at the time of arrest.

Marian Caporusso, the supervisor of the Chicago police department's serology unit, testified next, reporting on her examination of a slide and swab in the Vitullo Kit containing samples which had been taken from the victim and her examination of the defendant's undershorts. She stated that she found spermatozoa on the slide; that the acid phosphatase test she performed on the swab for the presence of semen was inconclusive, but that the swab was heavily stained with menstrual blood; and that spermatozoa heads were found on the undershorts defendant had been wearing at his arrest.

The defendant asked Caporusso about the slides the hospital had used, which she said she could not testify about with accuracy. She testified that she was given only the Vitullo Kit and its contents. Caporusso said that the different slides and different tests used at the hospital emergency room might not have revealed the presence of spermatozoa, while her tests would. She noted that she did not test the victim's underpants for the presence of spermatozoa because the slide contained spermatozoa. The defendant claimed that Caporusso could not be telling the truth when she testified that she found spermatozoa on the slide.

At the end of Caporusso's testimony, the State rested its case in chief. The defendant moved to dismiss on the grounds that there was no proof of penetration and that no spermatozoa had been found. He also argued that the State had withheld exculpatory information, that witnesses had been told to lie on the stand, and that he had been arrested solely because of his race. The defendant ended by saying that the entire case was fabricated solely because he was a witness against the State's Attorney and police department in another matter. The court found that there was sufficient evidence as to each of the charges and denied the defendant's motion for a directed verdict of not guilty. The court also denied defendant's motion for mistrial or judgment of acquittal because it found no evidence of fraudulent or perjured testimony.

The defendant called Nurse O'Donald, who worked in the hospital

emergency room and signed the receipt for the Vitullo Kit that was given to Officer Davie. She testified that the kit was already sealed when she gave it to Officer Davie.

Officer James Joseph Roberts, Officer DeCarlo's partner, testified that they had been assigned to respond to the report of a sexual assault, and when they did so, the officers spoke with the victim, her mother, and the mother's friend. The officers went to the scene at the victim's direction, before going to the hospital. The defendant handed Officer Roberts a copy of Officer DeCarlo's report, demanding that he find anything in the report to substantiate his testimony about going to the scene, which testimony the defendant stated was a lie. The jury was told to disregard commentary regarding the officer's honesty.

Officer Roberts also testified that they sent a "flash" radio message with a description of the offender to other police cars in the area. They then took the victim to the hospital. The defendant repeatedly demanded the officer read his partner's report and the dispatch card to prove that his testimony was false.

Officer James Loftus testified that he took the lineup photograph. He acknowledged that he knew what a dispatch card was, but indicated that his only contact with the case was to take photographs of the lineup.

Officer J. Jonagan testified that he had been on duty as a radio dispatcher on the evening of February 13, 1987, and testified that he had taken the initial emergency call made by the victim's brother regarding her attack. Officer Jonagan testified that his partner dispatched a car to the scene.

When the defendant could not find the photocopy he had been using, Officer Jonagan noted that he had been given the original card to bring to court when the defendant had misplaced his photocopy the day before. The defendant looked at the reverse side of the card and claimed that the State's Attorney was committing a deliberate and clear deception because the defendant had not seen what was written on the reverse, and because the defendant said this information had been added later. The State's Attorney noted that the description on the back appeared to corroborate the Officers' testimony regarding the "flash" radio message containing a description of the offender. After a lengthy sidebar discussion, the defendant continued his examination of the witness.

Officer Jonagan testified that while a partial description of the offender as given by the caller appeared on the front of the card, a more complete description appeared on the back. The defendant notes that the description on the front was in a blank for the caller's ad-

dress and on the back was apparently in boxes for other units or officers assigned to the case. Officer Jonagan noted that the dispatchers often took notes on "flash" messages on the back of a dispatch card in case a car called for a repeat of the information.

The defendant argued to the court that the card is a fraud and examined Officer Jonagan in detail about the card. The officer repeatedly gave the same answers and noted that the description was not required to be in any particular place on the card.

When the officer stepped down, the defendant accused the State's Attorney of a discovery violation, which the State's Attorney denied, pointing out that they had not even known of the dispatch card until trial, and that the original of the card had only been brought in when the defendant mislaid his copy. The court found no discovery violation because the witness had testified for the defense, and because the defendant was aware of at least the front of the card, if not the back.

Ray Lenz, of the Chicago police department's microscopy unit, testified regarding his tests of certain hair, fingernail, and other samples contained in the Vitullo Kit. He testified that he does not look for spermatozoa. Lenz testified that he found no debris in the sample of hair from the victim's head, although the defendant said that the scene of the crime would indicate that something should have been found, but Lenz noted that he did not know from what part of the victim's head the hairs were taken.

Lieutenant Robert Johnson, a dispatch officer with the Chicago police department, testified that information on the front of a dispatch card usually came from the officer who took the original emergency call, and information on the back of the card would have been relayed by the beat car which responded to the call. He also testified that, if the card were subpoenaed, a copy of only the front would be delivered because only the front is microfilmed and it is from the microfilms that subpoenas are answered. To obtain both sides, a person would have to specifically subpoena the original dispatch card and would have to do so within six months after the incident, after which the cards are destroyed.

Menda Rosario, a laboratory technician at the hospital, testified that she prepared slides from the victim, examined one, and found no sign of spermatozoa. She noted that the slide had not been stained and that her observation would be confirmed by a pathologist using a stained slide. She testified that the other slides had been made for various other departments, and one was also made for the police department.

Officer Michael Bruski, who handles subpoenas for the Chicago

police department's communications section, testified that the information on the front of a dispatch card usually came from the emergency call and that on the back was relayed by the beat officers and written on the card by the officer who gave them the assignment. Officer Bruski explained how subpoenas were answered, and noted that the defendant had requested the dispatch tapes from the evening of February 13 but had not requested the dispatch card. He noted that in this case it would be the responsibility of the records section to send a copy, which he said would probably be of the front of the card only.

After Officer Bruski stepped down, the defendant moved for a mistrial, arguing that he should have received the back of the dispatch card as well as the front, and he argued that the card must be fraudulent because if it were not he would have received it. The court denied the motion, saying that there had been no intentional wrongdoing by the police department and noting that the defendant's subpoenas clearly request only dispatch tapes.

The defendant recalled Dr. Fenyes, asking how he could have found spermatozoa in the victim's vagina on February 16 when she was not in the hospital on that date. Dr. Fenyes said that he had examined the slides which had been prepared from swabbings from the victim's vagina, and that he did not himself examine the patient. He explained how the emergency room doctor could find no spermatozoa and he could find spermatozoa.

Emmett Harmon, a chemist, was called by the defendant as an expert witness to offer testimony regarding secreters, antigens, blood group typing, and the laboratory reports prepared by the police department and the hospital. Harmon stated that spermatozoa would last only a very short time on shorts, and doubted that Caporusso could have found spermatozoa on the defendant's shorts. However, he also testified that he rarely looked for spermatozoa under such conditions because there was too great a chance for error and admitted that the only certain test for the existence of spermatozoa was a microscopic identification. Harmon refused to give an opinion on any specific test results because he had not examined the evidence.

Assistant State's Attorney Donald Jonker testified that he had been summoned to the police station on February 14, 1987, where he spoke with the arresting officers and with the victim. When the victim described her attacker's undershorts, he went to the defendant and asked him to lower his sweatpants; because defendant's undershorts matched those described by the victim, they were taken for use as evidence. After reviewing the information and the physical evi-

dence available, with the testimony of the victim and her mother, Jonker approved the charge against the defendant. Defendant asked whether Jonker was aware that there was no visible evidence of spermatozoa or trauma when he approved the charges, and Jonker replied affirmatively. When the defendant insisted that penetration is a requirement for the charge, the statute was obtained and the definition of "sexual penetration" read into the record. The defendant expressed disbelief that he could be charged with the forcible rape of an 11-year-old-girl, and Jonker pointed out that under the statute the charge was correct.

Detective Michael Porchardo was called, and a sidebar was held to discuss his testimony. Detective Porchardo was a codefendant with this defendant in a Federal case and had no involvement in the present case. The defendant argued that Detective Porchardo's testimony is relevant because the defendant was charged with aggravated criminal sexual assault only in retaliation for reneging on an agreement he had to testify against Willie "Flukey" Stokes, for which he had been paid money and given a car. Detective Porchardo was allowed to testify that he was aware of the defendant's involvement in a Federal case and that he had no involvement in the case here.

Assistant State's Attorney Larry Stasica prepared the information against the defendant and testified regarding the preliminary hearing which had been held. He said that he felt he had complied with discovery rules and did not fail to bring all significant information before the judge. Stasica said that because he did not present the emergency room report which reflected that no trauma or spermatozoa had been found, he did not violate the defendant's rights because the defendant had been represented by a public defender at the preliminary hearing, that the public defender had a copy of the medical reports, and that Stasica had no duty to bring the information to the attention of the judge. Stasica stated that he believed the victim's testimony, upon which the information was based, to be true.

Rad Maksimovic testified regarding the results of an acid phosphatase test, which tests for the presence of seminal fluid. He performed the test at the hospital on a sample of fluid taken from the victim and reported the results as "insignificant." However, he testified, this test would not definitively prove or disprove that a rape had occurred.

Public Defender Robert Lee testified about his investigations pursuant to the defendant's instructions after he had been assigned by the court to perform those activities. He noted that the house to which the garage belonged was not 6050 North Winthrop, as indi-

cated on all reports, but was 6032 North Winthrop. On cross-examination by the State, Lee noted that there was no number on the house and stated that he obtained the address by looking at mail in the mailbox.

Judge Bastone, who had presided over the preliminary hearing, testified regarding the testimony used at the preliminary hearing. After Judge Bastone agreed that perjured testimony cannot be used at trial, the defendant had him review the medical reports from the emergency room. The judge did not recall seeing or hearing about these reports before that time. He noted that if the defendant's statements regarding the medical reports were true, there was a violation of the law; however, he also noted that neither emission of semen nor vaginal trauma is required to prove penetration.

The defendant announced that he would call one of the assistant State's Attorneys who was trying the case, and after a discussion and protest by the assistant State's Attorney, Assistant State's Attorney Scott Nelson took the stand. He testified that he was aware no signs of trauma had been found on February 13, 1987; that the emergency room doctor did not find spermatozoa; that not all items listed for the Vitullo Kit but only certain relevant samples were to be in the kit; and that the Vitullo Kit did not verify the emergency room doctor's tests.

Investigator Donald Moriarty had been assigned to the defendant by the court and testified that he could find no addresses such as those in the police reports. He also testified that he had picked up slides from the hospital for examination by an independent expert. Investigator Ed Matthews, also assigned to the defendant by the court, testified that there were no addresses such as those in the police reports.

The defendant recalled Dr. Earl Grubbs, who gave essentially the same testimony he had previously given, describing his examination of the victim in greater detail, noting that she reported having felt pain in her scalp and vagina but that evidence of visible injury is not required for someone to feel pain. On cross-examination the doctor detailed use of and collection for the Vitullo Kit. He did note that he found no indication that a penis had been inside the victim's vagina.

The defendant then recalled Assistant State's Attorney Nelson and examined him regarding the medical and laboratory reports. The defendant then examined Nelson regarding the dispatch card and the defendant's subpoenas for tape recordings. Nelson testified that defendant requested the tapes after the 30-day period during which the tapes are held before they are reused and the information they

contain is destroyed. Nelson also noted that no report of samples of fluids taken from the victim conclusively linked the defendant to the attack.

Officer John Milewski, who had been working as dispatcher on the evening of February 13, 1987, was called as the State's rebuttal witness. He testified to the manner in which police assignments are made when a call comes in and why the additional description of the offender appeared on the back of the card, noting that the information would come from an investigating officer on the street.

The defendant called Assistant State's Attorney Cheryl Cesario as surrebuttal witness, over protest by the State's Attorneys. The court allowed Cesario to be examined as if she were a witness in the case in chief, and not a surrebuttal witness, permitting the defendant's questions to go far beyond the scope of surrebuttal. Cesario explained why all of the items listed in a letter from the hospital administrator would not be in the Vitullo Kit, primarily because those tests were not required by the nature of this attack. Cesario also answered defendant's questions regarding the results of laboratory tests.

After both sides rested, the defendant moved for a directed verdict, which the judge denied. The jury found the defendant guilty of all charges. Defendant's motion for a new trial and writ of error were denied. After a sentencing hearing, the defendant was sentenced to concurrent terms of 60 years for aggravated criminal sexual assault, seven years for robbery, and 15 years for aggravated kidnapping. Defendant appeals.

The first argument on appeal is that the judgment should be overturned because the information by which the defendant was charged was brought about by prosecutorial misconduct. The defendant claims that based upon the hospital report available at the time the charges were approved, the assistant State's Attorney knew that the victim had not been raped. The defendant claims that the same evidence should have been brought forth at the preliminary hearing, and failure to do so was a violation of discovery and led to the information being based upon perjured information.

■■ ■ The rules applicable to criminal proceedings instituted by indictment also apply to criminal proceedings instituted by information. (*People v. Wright* (1960), 25 Ill. App. 2d 474, 476, 167 N.E.2d 435, 437.) They do not require the degree and quality of proof that is required for a conviction, (*People v. McCracken* (1965), 61 Ill. App. 2d 457, 460, 209 N.E.2d 673, 674) and if valid on their face will suffice to require a trial of the charge on the merits. (*People v. Rivera* (1979), 72 Ill. App. 3d 1027, 1037-38, 390 N.E.2d 1259, 1267.) Generally an

indictment will not be quashed unless the defendant can show that it causes him a grave injustice. (*People v. Martin-Trigona* (1982), 111 Ill. App. 3d 718, 726, 444 N.E.2d 527, 533; *People v. Miller* (1981), 100 Ill. App. 3d 122, 126, 426 N.E.2d 609, 611.) The information will not be suppressed unless all the evidence upon which the information was based was subject to suppression. *People v. Mack* (1982), 107 Ill. App. 3d 164, 171, 437 N.E.2d 396, 402, citing *People v. Jones* (1960), 19 Ill. 2d 37, 41, 166 N.E.2d 1, 4.

An indictment may be based upon hearsay (*Costello v. United States* (1956), 350 U.S. 359, 100 L. Ed. 397, 76 S. Ct. 406; *People v. Creque* (1978), 72 Ill. 2d 515, 521, 382 N.E.2d 793, 795; *People v. Wirth* (1979), 77 Ill. App. 3d 253, 261, 395 N.E.2d 1106, 1112) or other testimony (*People v. Wolfe* (1983), 114 Ill. App. 3d 841, 845, 449 N.E.2d 980, 984) because its validity depends not upon the character of the evidence but upon its competence. (*Wolfe*, 114 Ill. App. 3d at 845, 449 N.E.2d at 984.) Unless the witness is legally disqualified, his testimony is considered competent. (*Jones*, 19 Ill. 2d at 42, 166 N.E.2d at 4; *People v. Melson* (1977), 49 Ill. App. 3d 50, 53, 363 N.E.2d 888, 891; *McCracken*, 61 Ill. App. 2d at 460, 209 N.E.2d at 674.) Here, the assistant State's Attorney was clearly competent to testify to these matters, and therefore, the evidence he presented was competent and the information was proper.

▮▮ The second issue on appeal is that the defendant was denied certain evidence by the prosecutor and for this reason his conviction must be overturned. The trial judge held a hearing to determine whether the rule set forth in *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, had been violated and found that the defendant had not met his burden of proof. The defendant argues that because he was not given the back of the dispatch card until trial, his rights were violated.

In *Brady,* the United States Supreme Court said that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97.) This has been further refined to mean that the evidence must be not only exculpatory but material to the defendant's case (*United States v. Bagley* (1985), 473 U.S. 667, 678, 87 L. Ed. 2d 481, 491, 105 S. Ct. 3375, 3381), causing either a reasonable doubt as to the defendant's guilt (*United States v. Agurs* (1976), 427 U.S. 97, 112, 49 L. Ed. 2d 342, 355, 96 S. Ct. 2392, 2402) or a reasonable probability that disclosure would have changed the outcome of the

case. (*Bagley*, 473 U.S. at 682, 87 L. Ed. 2d at 494, 105 S. Ct. at 3383.) If the nondisclosed evidence would not have affected the outcome, failure to reveal it does not deprive the defendant of a fair trial. (*People v. Olinger* (1986), 112 Ill. 2d 324, 342-43, 493 N.E.2d 579, 588.) To determine whether the omission rises to the level of constitutional error, the entire record must be examined. *Agurs*, 427 U.S. at 112, 49 L. Ed. 2d at 355, 96 S. Ct. at 2402.

The elements of a *Brady* violation include that the evidence was favorable to the defendant, that the prosecutor failed to disclose the evidence in response to a specific request, and that the evidence was material. (*People v. Velez* (1984), 123 Ill. App. 3d 210, 217, 462 N.E.2d 746, 751; *People v. Post* (1982), 109 Ill. App. 3d 482, 489, 440 N.E.2d 631, 637.) Here, the writing on the back of the dispatch card may have been material, but it fails the other two tests. Although the defendant requested dispatch tapes from the police department, he did not request the dispatch card; furthermore, the prosecution did not have the card and did not have any photocopies of it until the defendant was asked to give one to the State at trial. Additionally, the writing on the reverse side was not favorable to the defendant, as it contained a more detailed description of the offender which closely matched defendant's appearance. Thus, the fact that the reverse side of the dispatch card was not available to the defendant until his case in chief cannot be considered a violation of the *Brady* rule.

The defendant also argues that a proper chain of possession was not proven for the Vitullo Kit, and that the State failed to comply with two subpoenas for information. An examination of the record shows that the chain of possession was adequately proven at trial by the testimony of all persons involved at each link of the chain.

The third issue on appeal is the defendant's claim that the State permitted perjured testimony to be given at trial, both by testimony regarding items not in the record and by use of witness testimony that the State knew was false. This allegation is so important that it may be addressed even if it had not, as here, been properly preserved at trial and in the post-trial motions. *People v. Enoch* (1988), 122 Ill. 2d 176, 199, 522 N.E.2d 1124, 1136.

■ Defendant argues that because the officers who took the victim to the hospital did not report use of the Vitullo Kit, it should not have been used as evidence at trial. However, there was sufficient testimony by the hospital personnel regarding its use and the taking of samples from the victim, and the chain of possession of the kit from them to its being delivered to the police. Admission of the Vitullo Kit into evidence was not erroneous. *People v. Beard* (1966), 67 Ill. App.

2d 83, 87, 214 N.E.2d 577, 579.

■■ ■ Defendant also argues that the State deliberately elicited testimony which it knew to be false from the victim, her mother, police officers, laboratory personnel, and other witnesses. For testimony to be perjury, the witness must "under oath or affirmation, in a proceeding or in any other matter where by law such oath or affirmation is required, [make] a false statement, material to the issue or point in question, which he does not believe to be true." (Ill. Rev. Stat. 1987, ch. 38, par. 32—2(a).) Use of known perjured testimony is so fundamentally unfair that it is a denial of due process which mandates reversal. *People v. Martin* (1970), 46 Ill. 2d 565, 567, 264 N.E.2d 147, 148; *People v. Preston* (1978), 60 Ill. App. 3d 162, 179-80, 376 N.E.2d 299, 311; see also *Miller v. Pate* (1967), 386 U.S. 1, 7, 17 L. Ed. 2d 690, 694, 87 S. Ct. 785, 788; *Napue v. Illinois* (1959), 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 1221, 79 S. Ct. 1173, 1177; *Alcorta v. Texas* (1957), 355 U.S. 28, 31, 2 L. Ed. 2d 9, 11, 78 S. Ct. 103, 105; *Mooney v. Holohan* (1935), 294 U.S. 103, 112, 79 L. Ed. 791, 794, 55 S. Ct. 340, 342; 98 A.L.R. 406, 409-10 (1964).

It is essential that to commit perjury the witness must know that the statements being made are false. (*People v. Drake* (1978), 63 Ill. App. 3d 633, 635, 380 N.E.2d 522, 524; *People v. Boyd* (1980), 81 Ill. App. 3d 259, 261, 401 N.E.2d 304, 307.) Here defendant offers no proof that the statements are false, merely presenting conclusory allegations which cannot support a charge of perjury. (*People v. Brasfield* (1966), 35 Ill. 2d 560, 561, 221 N.E.2d 225, 227.) Minor conflicts between the witness' testimony at trial and at an earlier proceeding do not prove that the witness' testimony is perjured (*People v. Lagios* (1968), 39 Ill. 2d 298, 301, 235 N.E.2d 587, 589; *People v. Henderson* (1976), 36 Ill. App. 3d 355, 384, 344 N.E.2d 239, 261), and as with conflicts among the testimony of different witnesses, go merely to the credibility of the witness and of the evidence. (*People v. Tyner* (1968), 40 Ill. 2d 1, 3, 238 N.E.2d 377, 378.) None of the discrepancies in testimony alleged by the defendant is sufficiently significant or material to warrant a finding of perjury. *People v. Cihlar* (1984), 125 Ill. App. 3d 204, 208, 465 N.E.2d 625, 628-29.

■ The fourth issue on appeal is that the defendant's rights were violated because the trial court did not enforce the Uniform Act to Secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings (Ill. Rev. Stat. 1987, ch. 38, par. 156—1 *et seq.*) because many witnesses whom he subpoenaed or who were material to his defense did not appear. It must be noted that the defendant did not object at trial to the absence of any witness and released nu-

merous witnesses from subpoena. However, the right of a defendant to call witnesses in his own behalf is a fundamental right (*Chambers v. Mississippi* (1973), 410 U.S. 284, 302, 35 L. Ed. 2d 297, 312, 93 S. Ct. 1038, 1049) and essential to due process. (*Chambers*, 410 U.S. at 294, 35 L. Ed. 2d at 308, 93 S. Ct. at 1045; *Washington v. Texas* (1967), 388 U.S. 14, 19, 18 L. Ed. 2d 1019, 1023, 87 S. Ct. 1920, 1923.) For this reason, the defendant's argument must be addressed.

Defendant states that the State prevented Nurse "O'Donnell" from testifying, but the record clearly shows that Nurse O'Donald testified for the defendant, and her testimony matches that which the defendant claims "O'Donnell" would have given. There is no showing that Nurse O'Donald and Nurse "O'Donnell" were not one and the same person. There was no denial of due process regarding this witness for the defense.

The defendant also claimed that he was prevented from determining who wrote the description of the assailant on the back of the dispatch card. However, considerable testimony at trial regarding the source of the description identified Officer Milewski as the source, and defendant had asked that a subpoena be issued for his appearance at trial but later released Officer Milewski from the subpoena. Officer Milewski was subsequently called as a rebuttal witness by the State, and the defendant had the opportunity to cross-examine him. From the record, it does not appear that defendant's rights were violated with regard to this witness.

The defendant names many other witnesses whom he had requested to be subpoenaed but claims did not appear at trial. Defendant does not offer any facts to support his contention that these witnesses were material to his defense, nor is there any material in the record to this effect. Without such proof, we cannot say that the defendant's rights were violated and hold that, in light of all the evidence and testimony presented at trial, the failure of these witnesses to appear at trial did not amount to error. *People v. Robinson* (1961), 22 Ill. 2d 162, 170, 174 N.E.2d 820, 824; *People v. Nash* (1967), 36 Ill. 2d 275, 281, 222 N.E.2d 473, 476.

The defendant also protests that he was not given certain evidentiary materials to which he was entitled, but these arguments are addressed as a separate issue later in this opinion and will not be considered here under the issue of production of witnesses.

The fifth issue on appeal is that the trial judge should have recused himself when he became aware that he had signed warrants against defendant, among others, in another case. The record reflects that Judge Gillis did not recall signing the warrants until he was re-

minded of it at a pretrial hearing, and that at that time the defendant acquiesced to continuing before Judge Gillis. Furthermore, when at a subsequent pretrial hearing the defendant subpoenaed Judge Gillis, the judge recused himself and the case was transferred to another judge, but the defendant asked that the case be returned because Judge Gillis was familiar with the case. He withdrew the Gillis subpoena.

■ A defendant's right to a substitute judge for cause is not absolute; the defendant must support his allegations with an affidavit proving bias (*People v. Andricopulos* (1987), 162 Ill. App. 3d 899, 909, 516 N.E.2d 302, 307) such as animosity, hostility, ill-will, or distrust. (*People v. Matlock* (1981), 97 Ill. App. 3d 842, 844, 423 N.E.2d 976, 978.) The trial court is not required to justify its retention of the case. (*People v. Marshall* (1988), 165 Ill. App. 3d 968, 975, 521 N.E.2d 538, 542.) The mere fact that a judge has in a previous proceeding ruled adversely to the defendant does not disqualify the judge (*People v. Vance* (1979), 76 Ill. 2d 171, 178, 390 N.E.2d 867, 870) and does not require the judge to automatically recuse himself. (*People v. Neumann* (1986), 148 Ill. App. 3d 362, 369, 499 N.E.2d 487, 492.) Furthermore, the motion for substitution must be made at the earliest practical time, and once the judge has issued rulings on substantive issues the motion is untimely. *People v. Taylor* (1984), 101 Ill. 2d 508, 518, 463 N.E.2d 705, 711; *People v. Samples* (1982), 107 Ill. App. 3d 523, 526-27, 437 N.E.2d 1232, 1235.

■ Here, the defendant did not request a substitution of judges until several pretrial hearings had been held and a date for trial was set. Judge Gillis had not presided over another case involving defendant, but had merely signed some warrants, the specifics of which the judge did not recall until reminded of them by the defendant. Additionally, the defendant not only acquiesced to proceeding to trial before Judge Gillis but requested his reinstatement after Judge Gillis recused himself; where a defendant has proceeded to trial before a judge she had previously named in a motion for substitution, she was found to have waived any post-trial objections. (*People v. Bach* (1979), 74 Ill. App. 3d 893, 895-96, 393 N.E.2d 563, 566.) For all of these reasons, defendant's argument cannot stand.

■ The sixth issue on appeal is the use of the victim's prior consistent statement to her mother and to the police immediately after the attack to bolster her testimony at trial. The record does not reflect the use of such statement, although testimony regarding the victim's statements immediately after the attack were properly admitted as the spontaneous exclamations of a victim under 13 years. (Ill. Rev.

Stat. 1987, ch. 38, par. 115—10; *People v. Leamons* (1984), 127 Ill. App. 3d 1056, 1068-69, 469 N.E.2d 1137, 1146; *People v. Cregar* (1988), 172 Ill. App. 3d 807, 823-24, 526 N.E.2d 1376, 1387; *People v. Laremont* (1988), 174 Ill. App. 3d 201, 206, 528 N.E.2d 249, 252.) It should be noted that the cases upon which defendant relies are inapplicable here because of this exception.

The defendant also contends that the victim's report to the emergency room nurse and the police officers, as reflected in their reports, directly contradicted her testimony at trial. He focuses on the fact that the victim did not tell the emergency room nurse that the man who raped her had a gun and pulled her into an alley. He also contends that the victim's testimony at the preliminary hearing contradicts her testimony at trial, because at the preliminary hearing she did not testify beyond the facts of the rape, and so did not say that she ran home or that she took the police officers to the scene. However, an examination of the record does not reflect any major discrepancy among the victim's recitations of the incident. Any minor discrepancies which may exist go only to the victim's credibility.

■■ The seventh issue on appeal is defendant's claim that the trial judge's narration for the record of the victim's demonstration of the way the defendant pulled her into the alley was improper and constituted reversible error. However, it is appropriate for a trial judge to note for the record any demonstrative testimony which cannot otherwise be adequately depicted in the record. As the case cited by the defendant holds, a judge may go even further and interrogate witnesses to clarify testimony when necessary to effect an appropriate resolution of the case. (*People v. Palmer* (1963), 26 Ill. 2d 464, 470, 187 N.E.2d 236, 240.) Thus the trial judge's narration here was wholly proper.

■■ ■ The eighth issue on appeal is defendant's claim that the trial court committed reversible error by allowing the trial to be broadcast and by allowing the victim's testimony to be broadcast and televised. The record shows that this is an erroneous and distorted statement of what actually occurred. When the jury was scheduled to visit the scene of the attack, which the defendant specifically and repeatedly requested, the judge informed both sides that reporters would be at the scene. He also informed the jury that reporters would be present but would be asked to take photographs only from a distance. As the record reflects and as defendant acknowledges in his brief on appeal, the defendant spoke with the press at the scene.

Except for this incident, cameras were not present at the trial. No part of the victim's trial testimony was broadcast except that at

the scene in the presence of the cameras and in response to questioning she pointed to the places where she was abducted and raped. This clearly does not violate the directives of section 8—701 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 8—701).

Defendant claims that the subsequent television and radio broadcasts and newspaper articles prejudiced the jury against him because they included distorted information about his prior rape conviction. When the court was informed of the articles, the trial judge reviewed them and proceeded to question the jurors individually in chambers as to whether they had seen or heard any articles or broadcasts. It should be noted that every day, at the end of testimony, the judge warned the jury not to watch television, listen to the radio, or read newspapers while they were recessed and separated for the evening. This was done both before and after the jury visited the scene of the attack and the newspaper articles and news reports were published and broadcast.

Only one juror and one alternate admitted having seen or heard any of the challenged news reports. The alternate had seen one article and its accompanying photograph, but had not read the text of the article. Upon inquiry by both the judge and the defendant, he assured them that he was not affected by the article and that if he later found that the article would alter his judgment he would take the initiative and inform the court.

The juror had not seen or heard any articles or broadcasts. However, she mentioned that she had heard some discussion about the coverage among some of the jurors, and that connections to drugs and Willie "Flukey" Stokes were mentioned. The juror stated that despite hearing this she felt she could maintain an open and unbiased mind about the case. The defendant did not question the juror or in any way, either then or during the remainder of the trial, challenge her continued presence on the jury.

When possibly adverse publicity appears during a trial, the trial judge must determine whether any of the jurors are influenced by this publicity. (*People v. Hryciuk* (1954), 5 Ill. 2d 176, 183, 125 N.E.2d 61, 65.) To do this, the court must first review the publicity to determine whether it can be perceived as prejudicial (*People v. Cox* (1966), 74 Ill. App. 3d 342, 347, 220 N.E.2d 7, 10), but the mere fact that it may be prejudicial does not warrant a mistrial. (*People v. Henderson* (1976), 39 Ill. App. 3d 502, 506, 348 N.E.2d 854, 858.) Each case must turn on its own facts. *People v. Talley* (1987), 152 Ill. App. 3d 971, 980, 504 N.E.2d 1318, 1323.

In *Henderson*, eight jurors and one alternate had been exposed to

publicity about the trial, with six jurors and the alternate reading or hearing news reports which generally discussed the progress of the trial. The two remaining jurors had seen a news article about security at the trial; one had not read the article, and the other stated that he had read it but did not put much credence into it. The court there held that the exposure did not warrant the granting of defendant's motion for mistrial. *Henderson*, 39 Ill. App. 3d at 507, 348 N.E.2d at 859.

In *Talley*, several jurors had read an article detailing the refusal of a codefendant to testify against the defendant. The jurors assured the court that they would remain impartial and understood that the article could not be considered by them as evidence in the trial. The defense counsel asked no questions and did not request any further admonishment of the jurors. The court found that, based upon the copy of the article which was included in the record, the interrogation of the jurors, and the quantity and quality of evidence in the case, that there was no prejudice against the defendant and the trial court did not abuse its discretion. *Talley*, 152 Ill. App. 3d at 982, 504 N.E.2d at 1324.

Here, only two persons admitted any contact with the publicity. Both assured the court and the defendant that they would not be influenced. The judge continued to warn the jurors at the close of each day to avoid all news media and all outside conversations, even among themselves, regarding the case, and in the jury instructions cautioned the jurors to rely only upon the evidence presented in court. It cannot be said that the publicity, which the defendant apparently initiated, requires reversal.

■■■ ■ The ninth issue on appeal is whether the photographs of the scene of the attack were improperly admitted into evidence. For photographs to be admissible, they must be clear and accurate representations of that which they are supposed to portray. (*People v. Cheek* (1982), 93 Ill. 2d 82, 93, 442 N.E.2d 877, 882; *People v. Mines* (1971), 132 Ill. App. 2d 628, 631, 270 N.E.2d 265, 267.) They must be relevant to the issue (*People v. Donaldson* (1962), 24 Ill. 2d 315, 318, 181 N.E.2d 131, 133) and verified as true representations (*People v. Rolon* (1979), 71 Ill. App. 3d 746, 752, 390 N.E.2d 107, 111).

Here numerous witnesses, including the victim and the officers who answered the report of an attack, testified that the photographs truly and accurately represented the scene. The defendant's only argument against the admissibility of the photographs focuses on the discrepancy in the address of the site. This is a minor discrepancy and insufficient to negate the testimony, which clearly supports admissibil-

ity of the photographs, and goes merely to the credibility of the witnesses. Thus the trial court did not err in admitting the photographs of the scene as evidence. It should also be noted that the court admitted photographs submitted by the defendant into evidence, so the jury could make comparisons of the photographs and draw its own conclusions about any discrepancy.

■■■ ■ The tenth issue on appeal is defendant's argument that unsupported and erroneous expert testimony was introduced at trial. An expert is one whose qualifications and experience give him knowledge not known to the average person which would aid the jury in its determination. (*People v. Driver* (1978), 62 Ill. App. 3d 847, 852, 379 N.E.2d 840, 845.) Expert testimony can only be introduced upon a proper foundation of facts already in evidence. (*People v. Sanchez* (1973), 11 Ill. App. 3d 1079, 1083-84, 297 N.E.2d 230, 233; *Driver*, 62 Ill. App. 3d at 853, 379 N.E.2d at 846.) The defendant called one expert witness, Emmett Harmon, who was qualified by the State's Attorney on cross-examination. Harmon reviewed Caporusso's report and explained the tests she had performed. He explained that the results did not indicate the presence of defendant's blood grouping in the samples taken from the victim's vagina. Harmon also gave his opinion that spermatozoa would not survive on a man's undershorts for the length of time between the date the undershorts were taken from the defendant and the date Caporusso found spermatozoa on the shorts by microscopic examination. Although he had a subpoena out for Dr. Robert Stein, Cook County medical examiner, defendant did not call him to testify.

While lack of factual basis would be fatal to the testimony of an expert witness (*People v. Parr* (1971), 133 Ill. App. 2d 82, 86, 272 N.E.2d 712, 715; *People v. Collins* (1979), 71 Ill. App. 3d 815, 824, 390 N.E.2d 463, 471), here all the State's witnesses were not merely experts but were directly involved with the case and testified as to their own expertise and personal observations. Nurse Dolan and Dr. Grubbs testified to their examinations of the victim and the preparation of evidence for the Vitullo Kit, as well as slides for use by hospital personnel. Dr. Grubbs also testified to his preliminary examination of one slide. Dr. Fenyes testified to his examination of the hospital's slides. The defendant contends that Dr. Fenyes should not have been permitted to testify because the victim was not in the hospital on February 16, 1987, the date on which Dr. Fenyes performed his tests. However, Dr. Feynes clearly testified that he never examined the victim but that he reviewed slides made by the emergency room personnel.

Caporusso testified about her examinations and tests of the samples in the Vitullo Kit and on the victim's underpants and the defendant's undershorts. The defendant also contends that her testimony was false because it was contradicted by his expert's testimony. However, this conflict merely raises an issue of credibility for the jury to resolve. Allegations by the defendant, without more, cannot support his arguments of false or unsupported expert testimony. We find that their testimony was amply supported by the evidence, and reject defendant's argument that the trial judge committed error in admitting the medical testimony offered by the State.

■■■ ■ The eleventh issue on appeal addresses the sufficiency and accuracy of the jury instructions. The defendant argues that the jury was improperly instructed regarding the elements of criminal sexual assault and aggravated criminal sexual assault because there was no evidence of sexual penetration or any other harm to the victim. The defendant also argues generally that the instructions were contradictory and confusing, and that an essential element of the State's case was not properly before the jury, but because he does not indicate specifically where the instructions failed, this allegation cannot be addressed.

Illinois Supreme Court Rule 451(a) (107 Ill. 2d R. 451(a)) requires that an existing Illinois Pattern Jury Instruction, Criminal (2d ed. 1981) be used unless it does not accurately state the law. Here the State submitted IPI Criminal 2d No. 11.65 (Supp. 1987), which defines "sexual penetration" as "any contact, however slight, between the sex organ of one person and the sex organ of another person ***. Evidence of emission of semen is not required to prove sexual penetration." The defendant objected on the grounds that the testimony at trial was that there was full penetration, not slight, and the instruction was given over his objection.

The statutory definition of "sexual penetration" is "any contact, however slight, between the sex organ of one person and the sex organ, mouth, or anus of another person ***. Evidence of emission of semen is not required to prove sexual penetration." (Ill. Rev. Stat. 1985, ch. 38, par. 12—12(f).) Defendant repeatedly argued at trial that without evidence of trauma to the victim's vaginal area, and because her hymen was intact, there could have been no penetration. However, it is clear that the statutory definition does not require physical penetration but merely requires contact.

The IPI instructions were drafted to simply, accurately, clearly, and concisely state the law. (*People v. Haywood* (1980), 82 Ill. 2d 540, 545, 413 N.E.2d 410, 413.) Jury instructions are designed to inform

the jury of the correct principles of law so that it can reach a correct conclusion based upon the law and the evidence. (*People v. Mitchell* (1975), 27 Ill. App. 3d 117, 121, 327 N.E.2d 158, 161.) Because the instruction given accurately follows the statutory definition, we cannot say that the jury here was misinstructed regarding the law applicable in this case. Giving an instruction which accurately states the law is not error.

The defendant does argue that there was no evidence of penetration; however, we note that he focuses on the "common sense" definition of physical penetration instead of the statutory definition of contact. The victim testified clearly and unwaveringly at trial about the attack. Her testimony need not be perfect to be convincing, and the jury's determination as to her credibility and the weight to be given to the victim's testimony is entitled to great deference and will not be overturned absent a clear showing that it is erroneous. (*People v. Powell* (1985), 138 Ill. App. 3d 150, 156, 485 N.E.2d 560, 564.) Spermatozoa were found in samples taken from the victim in the emergency room; this is adequate corroborative evidence. We find that the statutory requirements were met, and there was no error in either the instruction or the jury's determination.

Defendant also argues that his sentence constitutes cruel and unusual punishment and is unlawful because he was sentenced for both a principal and inchoate offense. Defendant does not explain why his sentence constitutes cruel and unusual punishment, and based upon the record of the sentencing hearing, at which the State submitted considerable evidence and at which both the State and the defendant argued at length, we find the sentence appropriate.

However, the issue of improper sentencing must be addressed. The defendant was sentenced to concurrent terms of 60 years for aggravated criminal sexual assault, seven years for robbery, and 15 years for aggravated kidnapping. The defendant argues that the sentences for aggravated kidnapping and robbery must be vacated because they were the underlying felonies which raised the charge of criminal sexual assault to aggravated criminal sexual assault.

There are several factors which could independently raise criminal sexual assault to aggravated criminal sexual assault, including the respective ages of the accused (over 17 years) and the victim (under 13 years); whether the accused displayed, threatened to use, or used a deadly weapon or another object which resembled a deadly weapon; whether the accused caused bodily harm to the victim, or threatened the victim's life; or whether the assault was committed during the course of commission of another felony. (Ill. Rev. Stat. 1985, ch. 38,

par. 12—14(a).) The court here found that the aggravating factor was the age of the accused, which was over 17 years, and the age of the victim, which was 11 years at the time of the assault. Although robbery is a Class 2 felony (Ill. Rev. Stat. 1985, ch. 38, par. 18—1(b)) and aggravated kidnapping is a Class 1 felony (Ill. Rev. Stat. 1985, ch. 38, par. 10—2(b)(2)), neither is indicated as the aggravating factor here. Thus, the concurrent sentences for these offenses will not be vacated.

Based upon a careful examination of the record in this case, and for the reasons stated above, we find no errors and affirm the judgment of the trial court.

Judgment affirmed.

EGAN and McNAMARA, JJ., concur.